**This opinion was filed for record**

at ___8:00a.m. on Sept 15 2016___

*Susan L. Carlson*
**SUSAN L. CARLSON**
**Supreme Court Clerk**

**FILE**
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 1 5 2016

*Madsen, C.J.*
CHIEF JUSTICE

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LESLIE M. PENDERGRAST, as an individual, | ) ) ) | |
| | ) | No. 92324-8 |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT MATICHUK and JANE DOE MATICHUK, as individuals and in their marital capacity; BLAINE PROPERTIES L.L.C., a Washington State limited liability company, | ) ) ) ) ) ) | |
| | ) | En Banc |
| Petitioners, | ) | |
| | ) | |
| BANK OF THE PACIFIC, a Washington State corporation; MARK R. and CYNTHIA A. SANFORD, as individuals and in their marital capacity; and GINA M. LINGENFELTER and JOHN DOE LINGENFELTER, as individuals and in their marital capacity, | ) ) ) ) ) ) ) ) ) | Filed SEP 1 5 2016 |
| | ) | |
| Defendants. | ) ) | |

GONZÁLEZ, J.—Leslie Pendergrast and Robert Matichuk bought adjacent lots separated by a solid wooden fence. The fence enclosed a

venerable cherry tree on Pendergrast's lot. For several years, Pendergrast and Matichuk maintained their lots as if the fence was the boundary line between them. Unfortunately, the fence stood several feet from the deed line and, according to the legal description, on Matichuk's land. The cherry tree stood on the disputed part of Pendergrast's lot. Instead of suggesting mediation or arbitration or filing a quiet title suit, and over Pendergrast's strenuous objection and despite her tearful plea, Matichuk tore down the fence, built a new one on the deed line, and had the cherry tree cut down. Litigation ensued, and Pendergrast prevailed at summary judgment, at trial, and at the Court of Appeals. Matichuk claims the disputed land is his and if not, the jury gave Pendergrast too much relief. Finding no error, we affirm the Court of Appeals.

## FACTS

In 2006, Pendergrast and Matichuk bought separate lots in Blaine, Washington, from Tali and Cyrus Conine.[1] Matichuk bought two lots (one with a small house, one vacant), intending to build condominiums. Five months later, Pendergrast bought an adjoining lot that included a 1907 home

---

[1] The complaints name Robert Matichuk and his wife, several corporations, and subsequent grantees as defendants, but as it appears Robert held most of the property at issue as his separate property at the time the controversy arose and was the primary actor here, we refer to the defendants collectively as Matichuk.

she intended to turn into a bed-and-breakfast. Pendergrast, who had retired from a job as a nursing instructor after a car accident left her unable to safely handle medical equipment, hoped to use the bed-and-breakfast to generate income for herself and her disabled daughters.

At some point prior to either sale, a six-foot-tall, solid wooden fence was built, partially enclosing Pendergrast's parcel and separating her lot from the vacant parcel owned by Matichuk. The fence had been built about six to eight feet west of the deed line, enclosing the venerable cherry tree on the parcel with the 1907 home. The Conines' disclosure statement for the Pendergrast parcel asserted that there were no "encroachments, boundary agreements, or boundary disputes," suggesting they believed the fence was on the property line. Clerk's Papers (CP) at 33. Consistently, the Pendergrast property was described in the listing agreement as partially fenced. *Id.* at 32. The record does not include similar documents from the Matichuk sale, but at oral argument, Matichuk conceded that the Conines represented to him that there were no encroachments on his parcel. Wash. Supreme Court oral argument, *Pendergrast v. Matichuk*, No. 92324-8 (June 21, 2016) at 39 min., 16 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

The record does include Matichuk's deposition testimony that he paced off the lot and "came to the conclusion the fence was not on the property line. Actually, let me rephrase that, I came to the conclusion I didn't know where the fence was in relation to the property line." CP at 52. He testified he was not concerned about any discrepancy because he "was buying on the description of the property." *Id.* at 53. Nothing in the record suggests he sought clarification about the relation between the fence and the deed line before buying the lot.

Meanwhile, Pendergrast planned a nautically themed bed-and-breakfast that would make use of the house, several outbuildings, and a tree fort in the cherry tree she planned to make look like the bow of a ship and use as a viewing station. At some point, she called Matichuk to ask him if he would consider selling one of his parcels to her. Nothing came of that conversation, and Matichuk did not use the occasion to alert Pendergrast that he was concerned the fence between their properties was misplaced. Over the next few years, she discussed her plans with the city and invested about $130,000 in remodeling the home. During those years, she used and maintained the property up to the fence line. From time to time, she would have casual conversations with Matichuk. They never discussed the

4

boundary line. Pendergrast's plans suffered a significant setback when a pipe on an upper floor burst, necessitating costly repairs.

In 2008, Matichuk had the property surveyed and determined that the legal description of his lot extended several feet beyond the fence into the lot Pendergrast had purchased. The next year, by letter, he informed Pendergrast that he had discovered that the fence encroached on his land and that he intended to move it to the deed line, much to her distress. Pendergrast believed her parcel extended to the fence line and that moving it would leave her with insufficient room to develop the bed and breakfast. Via counsel, she informed Matichuk that she claimed the property enclosed by the fence and instructed him not to move the fence. When the letter was unavailing, Pendergrast called Matichuk in tears and begged him not to move the fence. The day after that call, Matichuk had the fence torn down. Later, Matichuk cut down the cherry tree.

Pendergrast sued, seeking, among other things, to quiet title in the strip of land between the old fence line and the new one. She also sought damages for trespass and timber trespass, including treble damages under the timber trespass statute, RCW 64.12.030. Both parties moved for summary judgment. Nothing in the record before us suggests that Matichuk opposed Pendergrast's summary judgment motion on the grounds that a material

question of fact was presented by his deposition testimony that he did not know where the fence was located in relation to the deed line. Instead, he contended that he was entitled to prevail at summary judgment because "there is absolutely no evidence that the common grantor ever established a boundary line different from the deeded boundary," "no evidence of any formal or specific agreement about the boundary," and "[no] evidence that the parties acted in a way after the sale to suggest that they agreed that the fence was the boundary." CP at 310-11. Judge Mura granted partial summary judgment in favor of Pendergrast in a brief order.

The parties went to trial on trespass and timber trespass. Pendergrast testified that she begged Matichuk not to move the fence, that she "felt violated," that his actions left her in serious financial straits at a time when she was carrying both of her disabled daughters' mortgages, and that she could not sell the house while the lawsuit was pending. 2 Verbatim Report of Proceedings (Jan. 30, 2014) at 51. We have not been provided with Matichuk's testimony. The jury was instructed that damages for both trespass (removing the fence) and timber trespass (cutting the cherry tree) "include economic and non-economic loss that you find was proximately caused by the trespass and/or timber trespass," and that if they found

Matichuk committed either trespass, they should consider whether his actions caused Pendergrast emotional distress. CP at 196.

The jury found for Pendergrast. It awarded her $5,200 in economic and $75,000 in noneconomic damages for the trespass. It awarded her $3,310 in economic and $40,000 in noneconomic damages for the timber trespass. The trial judge tripled the timber trespass economic damages under RCW 64.12.030 and .040, but declined to triple the noneconomic ones "because such a trebling is not specifically provided in RCW 64.12.030, which, as a penal or punitive statute, should be interpreted and applied literally and narrowly." *Id.* at 237. The judge also ordered equitable relief in the form of abatement of the trespass and the entry of new legal descriptions. Matichuk's motion for a new trial or reduction of noneconomic damages was denied.

Both sides appealed. The Court of Appeals largely affirmed. *Pendergrast v. Matichuk*, 189 Wn. App. 854, 355 P.3d 1210 (2015). It upheld the summary judgment ruling quieting title based on the common grantor award and declined to reduce the jury's award of noneconomic damages. *Id.* at 859. However, it concluded that the plain language of the timber trespass statute required the court to treble the noneconomic damages

found by the jury. *Id.* We granted review. 185 Wn.2d 1002, 366 P.3d 1243 (2016).

ANALYSIS

1. QUIET TITLE AND THE COMMON GRANTOR DOCTRINE

The quiet title action was decided on cross motions for summary judgment. We review summary judgment de novo. *Becerra Becerra v. Expert Janitorial, LLC*, 181 Wn.2d 186, 194, 332 P.3d 415 (2014) (quoting *Rivas v. Overlake Hosp. Med. Ctr.*, 164 Wn.2d 261, 266, 189 P.3d 753 (2008)).

It has long been the law in Washington that "[t]he location of a line by a common grantor is binding upon the grantees." *Turner v. Creech*, 58 Wash. 439, 443, 108 P. 1084 (1910) (citing *McGee v. Stone*, 9 Cal. 600 (1858)). A common grantor can "establish[] an 'on the ground' boundary line between" tracts of land sold to separate parties "that is binding on the common grantees," even when the deed describes a different boundary. *Thompson v. Bain*, 28 Wn.2d 590, 593, 183 P.2d 785 (1947). In the opinion characterized by *Washington Practice* as best encapsulating the doctrine, the Court of Appeals wrote:

> A grantor who owns land on both sides of a line he has established as the common boundary is bound by that line. *Fralick v. Clark Cy.*, 22 Wn. App. 156, 589 P.2d 273 (1978). The line will also be binding on grantees if the land was sold and purchased with

8

reference to the line, and there was a meeting of the minds as to the identical tract of land to be transferred by the sale. *Kronawetter v. Tamoshan, Inc.*, 14 Wn. App. 820, 545 P.2d 1230 (1976). The common grantor doctrine involves two questions: (1) was there an agreed boundary established between the common grantor and the original grantee, and (2) if so, would a visual examination of the property indicate to subsequent purchasers that the deed line was no longer functioning as the true boundary? *Fralick*, 22 Wn. App. at 160.

*Winans v. Ross*, 35 Wn. App. 238, 240-41, 666 P.2d 908 (1983); 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.22, at 546 (2d ed. 2004). We too find *Winans* usefully distills the doctrine.

In *Winans*, a common grantor had purchased two lots separated by a fence that was about 60 feet west of the deed line. *Winans*, 35 Wn. App. at 239-40. Later, and without moving the fence, the grantor sold each lot to separate purchasers. *Id.* The court found the fence had become the legal boundary between the two parcels despite the fact there was no direct evidence of an agreement between the parties to treat it as such or evidence that the grantor intended to move the boundary. *Id.* at 240-41. Once the "grantee purchases believing the indicated line is the true line, . . . the indicated line is binding between grantor and grantee. And their successors in title will also be bound by that line if, when they succeed to title, the indicated line is physically visible on the ground." 17 STOEBUCK & WEAVER, *supra*, § 8.22, at 546. "An agreement or meeting of the minds

9

between the common grantor and original grantee may be shown by the parties' manifestations of ownership after the sale." *Winans*, 35 Wn. App. at 241 (citing *Thompson*, 28 Wn.2d 590); *see also Turner*, 58 Wash. at 444.

Matichuk presents us with three grounds for reversing judgment in the quiet title action. First, Matichuk seems to suggest the common grantor doctrine is inconsistent with RCW 64.04.010, which states that "[e]very conveyance of real estate . . . shall be by deed." *See* Pet'r's Suppl. Br. at 1. But the common grantor doctrine has been recognized in this state since at least 1910 without the legislature indicating disapproval. *See Turner*, 58 Wash. at 443. This court will not overturn precedent without either "a clear showing that an established rule is incorrect and harmful," *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970), or a clear showing that the legal underpinnings of the precedent have been eroded, *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014) (citing *United States v. Gaudin*, 515 U.S. 506, 521, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)). Neither showing has been made here.

Second, Matichuk suggests that application of the common grantor doctrine was inappropriate because there was no evidence that the common grantor "actively and purposefully changed the boundary of his or her

10

property, and that change of boundary was made with full knowledge and recognition by the original grantee." Pet'r's Suppl. Br. at 2. Such evidence has been found sufficient to establish the first *Winans* element. *See Kay Corp. v. Anderson*, 72 Wn.2d 879, 436 P.2d 459 (1967); *Atwell v. Olson*, 30 Wn.2d 179, 190 P.2d 783 (1948); *Windsor v. Bourcier*, 21 Wn.2d 313, 150 P.2d 717 (1944); *Angell v. Hadley*, 33 Wn.2d 837, 207 P.2d 191 (1949); *Martin v. Hobbs*, 44 Wn.2d 787, 270 P.2d 1067 (1954). But we find nothing in our case law that holds such evidence is necessary. Instead, in several cases, a boundary by common grantor was found without proof of an active and purposeful change made with full knowledge and recognition of the original grantee. *See, e.g., Thompson*, 28 Wn.2d at 592-93; *Strom v. Arcorace*, 27 Wn.2d 478, 481-82, 178 P.2d 959 (1947); *Winans*, 35 Wn. App. at 241-42.

Third, Matichuk argues that the courts below erred by considering the fact that Pendergrast maintained the property up to the fence line for three years without Matichuk informing her that he believed it was not the boundary line. Pet'r's Suppl. Br at 6-7. But courts have looked to "the parties' manifestations of ownership after the sale" as evidence of the boundary line before. *Winans*, 35 Wn. App. at 241 (citing *Thompson*, 28 Wn.2d 590); *see also Strom*, 27 Wn.2d at 481-82 (looking to postpurchase

11

conduct as evidence of the adjusted boundary). This argument is

unavailing.[2]

Matichuk has shown no error in the trial court's summary judgment

on the quiet title action. Accordingly, we affirm.

## 2. DAMAGES

Next, we turn to Matichuk's claim that Pendergrast was not entitled to

statutory treble damages under the timber trespass statute for the loss of her

tree. The timber trespass statute provides in relevant part:

> Whenever any person shall cut down . . . any tree . . . on the land of
> another person . . . without lawful authority, in an action by the person
> . . . against the person committing the trespasses . . . any judgment for
> the plaintiff shall be for treble the amount of damages claimed or
> assessed.

RCW 64.12.030.[3] The purpose of the timber trespass statute is well

established: "to (1) punish a voluntary offender, (2) provide treble damages,

---

[2] Generously construed, Matichuk's argument suggests that his testimony that he "didn't know where the fence was in relation to the property line" created a material question of fact that should have prevented summary judgment. *See, e.g.*, Pet'r's Suppl. Br. at 6-7; CP at 52. But, perhaps strategically (at least in the record provided to this court) Matichuk did not raise his testimony before the trial court as a reason to avoid summary judgment and did not assign error to the trial court's summary judgment order on that basis. *See* Resp'ts'/Cross-Appellants' Opening Br. at 1. Instead, both at summary judgment and in his assignments of error, Matichuk pursued victory as a matter of law, not trial on the merits. Accordingly, we decline to consider whether Matichuk's deposition testimony presented a material question of fact that should have prevented summary judgment. For similar reasons, we decline to consider his belatedly raised argument that noneconomic damages should be limited to a multiplier of economic damages.

[3] This statute was amended during the course of this case to specifically include Christmas trees. LAWS OF 2009, ch. 349, § 4. The amendment does not affect this case.

and (3) 'discourage persons from carelessly or intentionally removing another's merchantable shrubs or trees on the gamble that the enterprise will be profitable if actual damages only are incurred.'" *Broughton Lumber Co. v. BNSF Ry. Co.*, 174 Wn.2d 619, 625, 278 P.3d 173 (2012) (quoting LAWS OF 1869, ch. 48, § 556, at 143). The timber trespass statute does not limit the types of damages subject to trebling as some more recent statutes do. *Compare* RCW 64.12.030 (timber trespass statute), *with* RCW 48.30.015(2) (providing for treble damages under the Insurance Fair Conduct Act limited to actual damages), *and* RCW 19.86.090 (Consumer Protection Act damages limited to actual damages and not more than $25,000).

It is also well established at least since 1997 that emotional distress damages are available under the timber trespass statute, though, until now, we have not been properly asked to decide whether those damages are subject to statutory trebling. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 110 n.3, 116, 942 P.2d 968 (1997). Pendergrast maintains, and the Court of Appeals agreed, that she is entitled to treble these damages under the plain language of the timber trespass statute. Since this requires us to interpret a statute, our review is de novo. *Broughton Lumber Co.*, 174 Wn.2d at 624-25 (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001)).

Matichuk argues that since "the timber trespass statute is penal in nature," it is "subject to strict construction." *Broughton Lumber Co.*, 174 Wn.2d at 633 (citing *Skamania Boom Co. v. Youmans*, 64 Wash. 94, 96-97, 116 P. 645 (1911)). He is correct that punitive damages are penal in nature and their award "violat[es] public policy unless expressly authorized by statute." *Id.* at 638 n.14 (citing *Barr v. Interbay Citizens Bank of Tampa*, 96 Wn.2d 692, 635 P.2d 441, 649 P.2d 827 (1982)). But however strictly we construe it, the timber trespass statute explicitly authorizes treble damages. RCW 64.12.030 says that "any judgment for the plaintiff shall be for treble the amount of damages claimed or assessed." Our goal in statutory interpretation is to carry out the legislature's intent, and here, that intent is plainly expressed. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

While certainly the legislature would be well within its power to limit emotional distress damages available under the timber trespass statute, it has not. We find under the plain language of the statute, Pendergrast is entitled to treble damages on all damages awarded under the timber trespass statute.[4]

---

[4] We agree that the legislature is well able to limit punitive damages as described in the concurring/dissenting opinion. But the fact is, despite almost 20 years to do so, the legislature has expressed no dissatisfaction with the *Birchler* opinion and has not limited the punitive damages to nonemotional distress damages. Without overruling *Birchler* (which no party asks us to do), there is no way to limit damages as proposed by the concurrence/dissent.

Matichuk also requests a new trial on the theory that the noneconomic damages were excessive. The jury awarded Pendergrast $5,200 and $3,310 in economic damages for the trespass and timber trespass respectively and $75,000 and $40,000 in emotional damages for each wrong. CP at 240. The trial court denied his motion for a new trial on this ground, and the Court of Appeals affirmed in a detailed ruling. *Pendergrast,* 189 Wn. App. at 867-72. We find no error in either decision. Briefly, a trial court may order a new trial when the damages awarded are "so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice." CR 59(a)(5). We review the trial court's decision for abuse of discretion. *Brundridge v. Fluor Fed. Servs., Inc.,* 164 Wn.2d 432, 454, 191 P.3d 879 (2008) (citing *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.,* 140 Wn.2d 517, 537, 998 P.2d 856 (2000)). "'An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.'" *Bunch v. King County Dep't of Youth Servs.,* 155 Wn.2d 165, 179, 116 P.3d 381 (2005) (quoting *Bingaman v. Grays Harbor Cmty. Hosp.,* 103 Wn.2d 831, 835, 699 P.2d 1230 (1985)).

Matichuk does not dispute that Pendergrast testified at length about the substantial distress his actions caused her. He argues he was not the real cause of her distress and instead other misfortunes in her life were the real cause of the distress she testified about at trial. These are proper arguments for the jury to resolve, and we decline to disturb its resolution. Matichuk also emphasizes that Pendergrast did not offer any corroborating testimony regarding her distress. But a jury's damages verdict may rest on the plaintiff's testimony alone. *Bunch*, 155 Wn.2d at 181 (citing *Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 487, 805 P.2d 800 (1991)). Pendergrast testified that she had spent about $130,000 to turn the house into a bed-and-breakfast that she intended to use as a source of income for herself and her disabled daughters. She testified that Matichuk's actions prevented her from completing the project and caused her severe distress. Matichuk has not shown that the jury's noneconomic damages award of $115,000 was outside the range of the evidence presented or that the trial court abused its discretion in declining to order a new trial. We affirm.

CONCLUSION

We affirm the trial court's summary judgment on the quiet title action and its denial of the motion for a new trial. We affirm the Court of Appeals' decision on damages under the timber trespass statute. As Matichuk is not

the prevailing party, his motion for attorney fees under the lis pendens statute is denied. We remand to the trial court for any further proceedings necessary consistent with this opinion.

Gonzáles, J.

WE CONCUR:

Stephens, J.

Wiggins, J.

George McCloud, J.

Owens, J.

Fairhurst, J.

Yu, J.

*Pendergrast v. Matichuk, et ux., et al.*

No. 92324-8

MADSEN, C.J. (concurring/dissenting)—I concur with the majority in affirming the Court of Appeals as to the quiet title action and the award of, and reasonability of, damages. I write separately because I would hold that the respondent is not entitled to treble damages for emotional distress under the timber trespass statute.

The timber trespass statute, RCW 64.12.030, provides in relevant part:

> Whenever any person shall cut down . . . any tree . . . on the land of another person . . . without lawful authority, in an action by the person . . . against the person committing the trespasses . . . any judgment for the plaintiff shall be for treble the amount of damages claimed or assessed.

Emotional distress damages are available under the timber trespass statute. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 116, 942 P.2d 968 (1997). And the majority is correct that the statute "does not limit the types of damages subject to trebling as some more recent statutes do." Majority at 13. However, the statute does not expressly authorize the trebling of noneconomic damages, and for this reason I would reverse the Court of Appeals as to trebling of emotional distress damages under the timber trespass statute.

The timber trespass statute is punitive in nature, and it is therefore "subject to strict construction." *Broughton Lumber Co. v. BNSF Ry. Co.*, 174 Wn.2d 619, 633, 278 P.3d 173 (2012) (citing *Skamania Boom Co. v. Youmans*, 64 Wash. 94, 96-97, 116 P. 645 (1911)). Punitive damages "violate public policy unless expressly authorized by statute." *Id.* at 638 n.14 (citing *Barr v. Interbay Citizens Bank of Tampa*, 96 Wn.2d 692, 635 P.2d 441, 649 P.2d 827 (1982)). "Our interpretive approach should account for this philosophical difference." *Id.* Although the timber trespass statute does not explicitly limit the types of damages subject to trebling, the more modern statutes do. *See, e.g.*, RCW 48.30.015(2) (providing for treble damages under the Insurance Fair Conduct Act limited to actual damages); RCW 19.86.090 (Consumer Protection Act damages limited to actual damages and not more than $25,000). The Consumer Protection Act, Laws of 2007, ch. 498, § 3; and the Insurance Fair Conduct Act, Laws of 1961, ch. 216, § 9; reflect decades of modern tort law development. The timber trespass statute, on the other hand, dates back to territorial, prestatehood days. *See* LAWS OF 1869, ch. 143, § 55. Respondent called nothing to our attention to suggest that the territorial legislature contemplated that people would have an emotional attachment to their trees and shrubs or had cause to contemplate whether timber trespass could cause emotional distress, let alone trebling of those damages. Indeed, the purpose of the statute was to "'discourage persons from carelessly or intentionally removing another's *merchantable* shrubs or trees on the gamble that the enterprise will be profitable if actual damages only are incurred.'" *Broughton Lumber Co.*, 174 Wn.2d at 625 (emphasis added) (quoting LAWS OF 1869, ch.

2

48, § 556, at 143). Because we construe punitive statutes strictly, and because the timber trespass statute does not expressly authorize trebling of punitive damages, I cannot say that the territorial legislature in 1869 intended to discourage the careless or intentional removal of merchantable timber by trebling damages for emotional distress. Therefore, I respectfully dissent in part.

No. 92324-8
(Madsen, C.J. concurring/dissenting)

_Madsen, C.J._

4