IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BARRY KIRKWOOD, an unmarried man, | No. 88166-3-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JAMES JOSEPH NELSON and SUMER D. NELSON, husband and wife, | |
| Appellants. | |

BUI, J. — Barry Kirkwood and James and Sumer Nelson (collectively Nelson) bought adjacent property from a common grantor. Kirkwood assumed the fence was the boundary line and filed suit to quiet title. After a bench trial, the court entered judgment based on the common grantor doctrine, establishing the fence as the boundary line rather than the boundary described on the deed. On appeal, Nelson challenges the application of the common grantor doctrine, the exclusion of evidence, and the dismissal of their ejectment counterclaim. We affirm.

FACTS

John and Kimball Wheaton (collectively Wheaton) owned property in Moses Lake, Washington, which they divided into separate parcels, Lot 6 and Lot 7. A wooden fence ran along the entire length of the southern boundary of Lot 6 separating the two lots. Bordering the fence on the Lot 6 side, was a horse-riding

pasture, another pasture, poplar trees, and next to the trees was a house. On both sides of the fence in the pasture, there were two standalone poplar trees.

On April 20, 2018, Wheaton sold Kirkwood the northern lot, Lot 6. Wheaton retained Lot 7 but later sold it in July of 2018 to Nelson.

The horse-riding pasture's four corners were surrounded by fencing affixed with light poles and sprinklers serving as lighting and irrigation for the pasture. The light control switches were in the shop located southwest of the home, and the valves to operate and maintain a shared irrigation system between the two lots were located on the northernly boundary of Lot 7.

Kirkwood acquired Lot 6 by statutory warranty deed recorded on June 25, 2018. The deed contained a description of Lot 6 by metes and bounds and did not mention the fence or any structures thereon.

Before purchase, Kirkwood and Wheaton entered into an easement agreement. The easement granted Kirkwood the ability to maintain and repair the irrigation supply line located on Lot 7's northern property for approximately 10 feet. The valves to operate and maintain the irrigation system were located on Lot 7. The well that supplies the water for the irrigation system was located on Lot 6. Kirkwood depended on this irrigation system for water to his pasture and his property, and the purpose of the easement was to "maintain[] and repair[] the irrigation supply line."

According to the real estate listing of Lot 6, the property was described as having a "fenced pasture," which at the time of purchase, consisted of a fence that enclosed the entire pasture area, and the wood fence still exists today.

2

Kirkwood testified when he purchased the property, he could see fencing enclosing his entire pasture and the horse-riding area.

In July of 2018, Wheaton sold Nelson the southern lot, Lot 7, which the fence separated from Lot 6. The fence ran the length of the northern boundary of Lot 7, which was barren, excluding a couple shrubberies. Prior to purchase, Nelson testified he knew the fence was on his property but did not say anything to Kirkwood or Wheaton. He "thought he could figure it out with [Kirkwood]."

The Nelsons acquired Lot 7 by statutory warrant deed recorded on July 2, 2018. Lot 7 was described by metes and bounds, and there was no mention of a fence or any other structure. The Nelsons believed the statutory deed established the boundary line, which was denoted by a row of poplar trees and "a series of monuments." Lot 7 was a bare lot, and it was irrigated with water and irrigation lines coming from Lot 6.

Sometime around July 2018, Nelson told Kirkwood the fence was on Nelson's property and wanted it moved. Kirkwood obtained a survey, and it revealed that the fence was encroaching approximately 8 to 10 feet northernly into Lot 7. The disputed portion did not incorporate fixtures such as light poles, irrigation control valves, frost-free faucet, horse shed, or watering trough.

Kirkwood filed a complaint against Nelson quieting title by adjusting the boundary line under the common grantor doctrine. He also brought claims of trespass and reformation of the easement. Nelson counterclaimed for declaratory judgment, ejectment, and trespass and waste.

At the bench trial, the court heard testimony from real estate broker Edda

3

Sievers, Kirkwood, and James Nelson. Wheaton did not testify. The court found in favor of Kirkwood, concluding that the southernmost surface of existing fence represented the property boundary, rather than the line described in the deed.

The court entered a judgment and directed Kirkwood and the Nelsons to complete and submit a Segregation/Boundary Line Adjustment Application to the Grant County Planning Department. The trial court denied Nelson's counterclaims.

Nelson timely appealed.

ANALYSIS

Nelson contends the ownership of the disputed strip of land that lies on Lot 7's northwest corner and south of Lot 6's horse-riding pasture, should be established by the deed line rather than through boundary by common grantor. We disagree.

Generally, a bona fide purchaser of an interest in real property is entitled to rely on record title. Levien v. Fiala, 79 Wn. App. 294, 299, 902 P.2d 170 (1995). However, a common grantor can "establish[ ] an 'on the ground' boundary line between" tracts of land sold to separate parties "that is binding on the common grantees," even when the deed describes a different boundary. Thompson v. Bain, 28 Wn.2d 590, 593, 183 P.2d 785 (1947). The line will also be binding on grantees if "the land was sold and purchased with reference to the line, and that there was a meeting of the minds as to the identical tract of land to be transferred by the sale." See Kronawetter v. Tamoshan, Inc., 14 Wn. App. 820, 826, 545 P.2d 1230 (1976).

4

A meeting of the minds does not require a formal or specific agreement. Thompson, 28 Wn.2d at 592. Rather, agreement or meeting of the minds between the common grantor and the original grantee may be shown by the parties' manifestations of ownership after the sale. Winans v. Ross, 35 Wn. App. 238, 241, 666 P.2d 908 (1983) (citing Thompson, 28 Wn.2d at 592).

Application of the common grantor doctrine presents two questions: "(1) was there an agreed boundary established between the common grantor and the original grantee, and (2) if so, would a visual examination of the property indicate to subsequent purchasers that the deed line was no longer functioning as the true boundary?" Pendergrast v. Matichuk, 186 Wn.2d 556, 564, 379 P.3d 96 (2016) (citing Winans, 35 Wn. App. at 240–41).

Nelson argues substantial evidence does not support Kirkwood and Wheaton had a meeting of the minds that the fence line constituted the boundary of the disputed land. We disagree.

We review the trial court's decision following a bench trial to determine "whether the findings of fact are supported by substantial evidence and whether those findings support the conclusions of law." 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 705, 281 P.3d 693 (2012). The substantial evidence standard is satisfied if there is sufficient evidence "to persuade a rational, fair-minded person of the truth of the finding." Hegwine v. Longview Fibre Co., 162 Wn.2d 340, 353, 172 P.3d 688 (2007) (quoting In re Est. of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)). If that standard is satisfied, we will not substitute our judgment for that of the trial court even if we might have resolved

5

disputed facts differently. Green v. Normandy Park Riviera Section Community Club, Inc., 137 Wn. App. 665, 689, 151 P.3d 1038 (2007) (citing Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). Neither party challenges the trial court's findings of facts, thus, they are verities on appeal. Jones, 152 Wn.2d at 8.

Here, both Kirkwood and Nelson are grantees of Wheaton, the original grantor. Kirkwood, who acquired his property prior to Nelson, maintains he and Wheaton had the necessary meeting of the minds that Lot 6 extended to the fence. To support this, Kirkwood points to fixtures on or surrounding the fence, his improvements to the disputed strip, and the Wheaton's demonstration of how to utilize fixtures, as well as his 15 years of use of the property up to, including, and beyond the fence. Nelson asserts that Kirkwood had no such agreement with Wheaton because Wheaton created an easement for the irrigation supply line, located at or under the fence.

The parties do not dispute that Wheaton, as their common grantor, conveyed their respective parcels as separate properties divided by a fence. It is also undisputed that Kirkwood's horse-riding pasture was surrounded by four corners of fencing affixed with light poles and sprinklers solely for the benefit and use of the pasture. The controls of the light fixtures were in the shop, which was on Lot 6, which Wheaton taught Kirkwood to operate. And that throughout his ownership, in addition to maintaining the sprinkler and light systems, Kirkwood added various improvements to the disputed strip, such as the telephone light in the back by the horse-riding arena, the frost-free faucet by the shed, also called

the horse shelter, the irrigation control valves, the main irrigation valve and the water trough.

Rather, it appears, Nelson is arguing that if Kirkwood and Wheaton believed the fence was the boundary line, the easement agreement for irrigation supply would be unnecessary because the irrigation supply line is on or about the fence line. However, Kirkwood's use of the irrigation system indicates otherwise. The easement agreement permits Kirkwood to go 10 feet into the northern boundary of Lot 7. Kirkwood testified that the irrigation box to control the irrigation line for Lot 6 is roughly 10 feet south of the fence, which he regularly used and maintained, until he later cut the feeder line at the valve box to separate the irrigation systems. Therefore, the location of the irrigation box, and Kirkwood's use of the system without interference from the owner of Lot 7, further supports Kirkwood and Wheaton had a meeting of the minds that the fence was the boundary line.

A visual examination of the property also gave notice that the fence served as the true boundary. Nelson contends that pins located underground that were referenced in the record title and the poplar trees put Kirkwood on notice that the boundary line was not the fence, and Kirkwood was put on notice that he independently should verify the boundaries by the addendum to purchase and sale agreement. Winans rejected a similar argument that because parties purchased lots by legal description, there was no agreement between them as grantees that the fence was the boundary. Winans, 35 Wn. App. at 241–42. The court held as long as "substantial evidence supports the conclusion that the

7

fence provided notice to subsequent purchasers that it was the boundary," this boundary would bind those purchasers. <u>Winans</u>, 35 Wn. App. at 242.

Here, the fence visually cut the property in half. The fence enclosed two of the four corners of the horse-riding pasture and aligned with the trees surrounding the home located on Lot 6. Property south of the fence was barren, excluding a few shrubberies. Contrastingly, the pins referenced by Nelson are not visible from the aerial image of the property. Kirkwood testified that he was not made aware if the pins were located when he had the property surveyed. The two poplar trees located on Lot 6 also do not clearly denote a boundary line; neither do the two poplar trees on Lot 7 which mirror those on Lot 6. Wheaton sold two adjacent properties separated by an unambiguous visual boundary—a fence.

Therefore, substantial evidence supports the trial court's conclusion that Wheaton and Kirkwood had a "meeting of the minds" as to the fence being the boundary between the two lots.

Nelson further contends the trial court erred in excluding evidence and testimony about what Wheaton told Kirkwood about the fence. We disagree. Nelson sought to admit, through cross examination of Kirkwood, Kirkwood's response to interrogatory 14, which asked to indicate any conversation Kirkwood had with Wheaton "regarding the property which you claim is subject to the 'Common Grantor' doctrine." Kirkwood's response to the interrogatory was "the Wheatons said they thought the boundary line was at the fence, but they weren't sure." Nelson argued the statement was not hearsay because "[i]t's being offered

8

to show [the effect of Wheaton's statement on Kirkwood,] that there was no belief that the fence was the boundary line." The trial court ruled that the statement was offered for the truth of what Wheaton told Kirkwood.

On appeal, citing to Thompson v. Peninsula Sch. Dist. No. 401,[1] Nelson argues that the statement is "relevant to show the state of mind of the listener." At trial, Nelson argued an "effect on the listener" hearsay exception; on appeal, Nelson argues "state of mind of the listener" exception. We may refuse review any claim of error that was not raised in the trial court. RAP 2.5(a).

Even if the trial court erred in excluding the statement, there is still substantial evidence to support the court's conclusion there was a "meeting of the minds." Regardless whether Wheaton represented they were unsure if the fence was the boundary line, no formal, specific, or separate contract as to the boundary lines is necessary. See Winans, 35 Wn. App. 241 (citing Thompson, 28 Wn.2d at 592). Additionally, as discussed supra, there is substantial evidence supporting that Wheaton and Kirkwood agreed the fence was the boundary between the two lots.

In conclusion, substantial evidence supports the trial court's conclusion that Wheaton and Kirkwood had a meeting of the minds that the fence was the boundary, and the visual examination of the property indicated to subsequent purchasers that the deed line was no longer functioning as the true boundary.

Given our decision that the trial court did not err in applying the common grantor doctrine, the trial court also did not err in dismissing Nelson's

---

[1] 77 Wn. App 500, 503, 892 P.2d 760 (1995).

9

counterclaim for ejectment.

We affirm.

_Bui, J._

WE CONCUR:

_Díaz, J._                          _Mann, J._