[Nos. 34617-2-I; 36611-4-I. Division One. May 5, 1997.]

WILLIAM R. BRYANT, ET AL., *Respondents*, v. PALMER
COKING COAL COMPANY, ET AL., *Appellants*.

*Douglas W. Ahrens, Douglass A. North,* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* for appellants.

*Garold E. Johnson* and *Mann, Johnson, Wooster & McLaughlin, P.S.,* for respondents.

Cox, J. — William and Maxine Bryant commenced this action to quiet title to two parcels of property in Black Diamond owned by Palmer Coking Coal Company. The trial court ruled that Bryant established adverse possession to the surface rights of both parcels. But the court also concluded that Bryant did not adversely possess the underground mineral rights to either parcel. Palmer ap-

peals the decision that divests it of title to the surface rights. Bryant cross-appeals the trial court's determination that he did not acquire subsurface mineral rights by adverse possession. We affirm in part and reverse in part.

Bryant commenced this action in 1987. For reasons that are not relevant to this appeal, trial of the adverse possession claim did not occur until February 1994.

A diagram of the parcels that are the subject of the dispute follows.

Parcel 1 is in the northeast portion of the preceding diagram. It is bounded to its north and east by the Pacific Coast Railroad right of way. Parcel 2 is a triangular-shaped parcel whose longest side extends roughly two-thirds across the width of the diagram. Parcel 2A is a trapezoid-shaped parcel within Parcel 2. Ultimately, the trial court held that Bryant established adverse possession to the surface of Parcel 1 and Parcel 2A. Parcel A and Parcel B lie between Parcel 1 and Parcel 2. Parcel C is south of and shares a common border with Parcel 2. All of these parcels are located in a predominantly agricultural and forested area in King County.

In 1939, Pacific Coast Coal Company (Pacific) sold Parcel A to Bryant's predecessor in interest. Pacific was the predecessor in interest to Palmer. Bryant and his predecessor believed that Parcel 1 was part of the sale. As a result, they conducted a number of activities on Parcel 1. These included clearing the land of brush and blackberries, planting wheat, fencing part of the property, grazing livestock, storing construction materials and debris, and storing some vehicles. These uses of Parcel 1 began on or before the 1939 purchase date of Parcel A and continued to at least 1983. In the early 1950s, Bryant constructed part of an airstrip runway on this parcel.

In 1948, Bryant purchased Parcel B from Pacific. This parcel lies to the west of Parcel A.

In 1950, Bryant leased a strip of property (Parcel L) from Pacific. As the diagram in this opinion shows, Parcel L is west of Parcel B and lies within Parcel 2A. Bryant built an airstrip on this leased property.

In 1954, Pacific sold certain property to Bryant. Bryant believed he was purchasing Parcel C as well as the area designated on the diagram as Parcel 2. He later discovered that the deed of conveyance did not include Parcel 2. According to Bryant, he approached John Morris, then president of Palmer, and explained the misunderstanding. He testified that in 1956 he paid Morris for a deed for the shortage. Morris gave Bryant a deed, but Bryant never recorded it. The original deed was lost in a fire.

Immediately following the 1954 purchase, Bryant began to use a substantial portion of Parcel 2 for a variety of purposes. He constructed a road that he established with the seller along the northern boundary line of Parcel 2. He used this road to get to cars he parked in clearings on the parcel. He used the same road to get wood and to haul dirt. In 1956, he built more roads on the property and cleared a space for more cars. In 1959 or 1960, Bryant obtained a Chrysler/Plymouth agency and his use of the land for car storage escalated. He sometimes kept a doberman on the property to prevent vandalism of the cars.

Palmer presented evidence of its own use of Parcel 2. In 1959, Palmer granted a prospecting permit to a mining company for coal and mineral prospecting on a portion of Parcel 2. The company later leased that portion of the parcel until 1968.

The trial court concluded that Bryant had adversely possessed the surface rights to Parcel 1. It reached the same conclusion for Parcel 2A, the easterly half of Parcel 2. But the court determined that Bryant failed to prove adverse possession of the underground mineral rights of either parcel.

After two post-trial motions, Palmer appealed the trial court's decisions that Bryant established adverse possession to the surface of the parcels. Bryant cross-appeals the trial court's conclusion that adverse possession did not include the mineral rights to the parcels.

I

Adverse Possession of Surface Rights

To establish a claim of adverse possession, there must be a showing that possession is "(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile."[1] Such possession must continue for a period of 10

---

[1] *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989).

years.[2] It is well established in Washington case law that use must be such as an owner of the type of property in question would make.[3] What constitutes adverse possession of a particular tract of land depends on the nature, character and locality of that land, and the uses to which land of that type is ordinarily put.[4] Once title by adverse possession is acquired, it cannot be divested by acts other than those required when title is acquired by deed.[5]

■ Whether adverse possession has been established by the facts as found is a question of law,[6] which we review de novo. We must uphold the trial court's findings if they are supported by substantial evidence.[7] Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise.[8] This rule is "based upon the theory that there is a conflict in the testimony and that the trial court, having the witnesses before it, is in better position to arrive at the truth than is the appellate court."[9]

■ Palmer does not make any argument challenging the court's determination that Bryant acquired title by

[2]RCW 4.16.020.

[3]*Timberlane Homeowners Ass'n v. Brame*, 79 Wn. App. 303, 309-10, 901 P.2d 1074 (1995), *review denied*, 129 Wn.2d 1004 (1996); *Selby v. Knudson*, 77 Wn. App. 189, 196, 890 P.2d 514 (1995).

[4]*Anderson v. Hudak*, 80 Wn. App. 398, 403, 907 P.2d 305 (1995) (citing *Frolund v. Frankland*, 71 Wn.2d 812, 817, 431 P.2d 188 (1967), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853, 676 P.2d 431 (1984)).

[5]*El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855, 376 P.2d 528 (1962) (citing *Mugaas v. Smith*, 33 Wn.2d 429, 206 P.2d 332, 9 A.L.R.2d 846 (1949); *McInnis v. Day Lumber Co.*, 102 Wash. 38, 172 P. 844 (1918)).

[6]*Peeples v. Port of Bellingham*, 93 Wn.2d 766, 771, 613 P.2d 1128 (1980), *overruled on other grounds by Chaplin*, 100 Wn.2d 853.

[7]*Reitz v. Knight*, 62 Wn. App. 575, 582, 814 P.2d 1212 (1991) (citing *Staaf v. Bilder*, 68 Wn.2d 800, 803, 415 P.2d 650 (1966)).

[8]*In re Marriage of Hall*, 103 Wn.2d 236, 246, 692 P.2d 175 (1984) (citing *Smith v. Shannon*, 100 Wn.2d 26, 666 P.2d 351 (1983); *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 638 P.2d 1231 (1982)).

[9]*Peeples*, 93 Wn.2d at 772 (quoting *Shultes v. Halpin*, 33 Wn.2d 294, 306, 205 P.2d 1201 (1949)).

adverse possession to the surface of Parcel 1. It does not assign error either to the factual findings or the legal conclusions for that parcel. Thus, Palmer impliedly concedes that this portion of the court's decision was correct. Accordingly, we do not disturb that portion of the judgment.

The principal focus of Palmer's arguments is Parcel 2A, the trapezoid-shaped portion of Parcel 2 that the trial court held Bryant acquired by adverse possession. More precisely, Palmer argues that the trial court failed to establish that Bryant's use of the western half of the property was open and notorious. It also contends that Bryant's use of the airstrip was not exclusive, but concedes that use of the runway and immediate surrounding areas was open and notorious. Palmer also claims that the trial court's conclusion that Bryant possessed Parcel 2A to the boundaries set by the court is not supported by substantial evidence. It makes a similar claim with respect to the court's finding that pilots unknown to Bryant landed at the airstrip with Bryant's express or implied permission and in accord with pilot custom.

## A
### Open and Notorious Use

Palmer contends that Bryant's use of the portion of Parcel 2A in the forested area west of the airstrip and its immediate vicinity was not open and notorious. First, it contends that a parcel lacking well-defined boundaries is not subject to adverse possession. It claims that the northern and western boundaries of Parcel 2A were not sufficiently defined. Second, it argues that Bryant's use of the parcel was insufficient to put Palmer on notice of the adverse possession. Finally, it claims that there is insufficient evidence in the record to support either the court's placement of the northern and western boundaries or Bryant's use of the property.

Open and notorious use is such use that would

lead a reasonable person to assume that the claimant was the owner.[10] In *Hunt v. Matthews*,[11] we said

> The acts constituting the warning which establishes notice must be made with sufficient obtrusiveness to be unmistakable to an adversary, not carried out with such silent civility that no one will pay attention. . . . Real property will be taken away from an original owner by adverse possession only when he was or should have been aware and informed that his interest was challenged.

Palmer claims that the cases require that there be well-defined boundaries to property acquired by adverse possession. The cases do support this requirement.[12] But the boundaries established by the trial court here meet this test.

An adverse possessor need not enclose the claimed parcel.[13] Moreover, the trial court need not "find a blazed or manicured trail along the path of the disputed boundary; it is reasonable and logical to project a line between objects when the extent of the adverse possessor's claim is open and notorious as the character of the land and its use requires and permits."[14] A boundary may be defined by the use of the property itself,[15] by a natural feature,[16] or by a fence.[17]

Palmer contends that a dirt road along the northern

---

[10]*Anderson*, 80 Wn. App. at 405.

[11]8 Wn. App. 233, 236-37, 505 P.2d 819 (1973), *overruled on other grounds by Chaplin*, 100 Wn.2d 853.

[12]*Skoog v. Seymour*, 29 Wn.2d 355, 364-65, 187 P.2d 304 (1947) (quoting *Heinrichs v. Polking*, 185 Ky. 433, 215 S.W. 179, 182 (1919)), *overruled on other grounds by Chaplin*, 100 Wn.2d 853; *Scott v. Slater*, 42 Wn.2d 366, 369, 255 P.2d 377 (1953) (stating that *Skoog* requires a well-defined boundary), *overruled on other grounds by Chaplin*, 100 Wn.2d 853.

[13]*Skoog*, 29 Wn.2d at 364.

[14]*Lloyd v. Montecucco*, 83 Wn. App. 846, 854, 924 P.2d 927 (1996).

[15]*See Lloyd*, 83 Wn. App. at 853-54.

[16]*See State v. Stockdale*, 34 Wn.2d 857, 210 P.2d 686 (1949), *overruled on other grounds by Chaplin*, 100 Wn.2d 853.

[17]*Wood v. Nelson*, 57 Wn.2d 539, 540, 358 P.2d 312 (1961).

portion of Parcel 2 may not constitute a boundary for the purpose of adverse possession of undeveloped forest land. We disagree.

Palmer properly concedes in its brief that a boundary can be established by the use itself. William Bryant allegedly used Parcel 2A to store cars. He cut the road on the northern boundary to serve this purpose by providing access to the cars. Because the construction and use of this northern road on Parcel 2A was for a use establishing adverse possession, the road constituted the boundary of the use.

Here, the court found that Bryant constructed the road and considered it the northern boundary of the property. The other roads Bryant constructed were south of this boundary road. The northern boundary road was a well-defined boundary for the adverse use established at trial.

Palmer also argues that evidence of a fence is necessary to establish adverse possession to the westerly half of Parcel 2A, citing *Wood v. Nelson*.[18] Palmer's reliance on *Wood* is misplaced. In *Wood*, the claimant built a fence 20 feet beyond the property line. The court held that while Wood's use of part of the property for occasional grass cutting would normally fail to support a claim of adverse possession, that result was different where the disputed property was fenced.[19] This holding does not establish that an adverse possessor *must* enclose undeveloped land in order to possess it.

Palmer next argues that Bryant's use of the westerly half of Parcel 2A was not sufficient to establish adverse possession. It contends that the construction of roads, clearing of openings, storage of cars, and construction of various structures is not enough to put an owner of undeveloped forest land on notice of an adverse claim.

The trial court found that Bryant's claim to Parcel 2A was supported by evidence that Bryant cut a road, cleared

[18]57 Wn.2d 539.

[19]*Wood*, 57 Wn.2d at 540.

openings, built a structure, cut wood, parked 50 to 100 vehicles, kept a horse and guard dog, and built a 7,000-gallon diesel fuel tank there. The trial court did not distinguish between activities that took place in the immediate vicinity of the airstrip, which is in the eastern portion of the parcel, and those that occurred in the forested, undeveloped area to the west. Palmer contends that Bryant merely "cleared some dirt roads, some larger clearings[,] and parked used vehicles in the clearings" in this latter area.

The cases Palmer cites to support its argument that Bryant's use was insufficient for this purpose involve lesser uses than those the court found in this case. In *Murray v. Bousquet*,[20] the adverse possessor used wild, mountainous land to pasture cattle and horses during the summer. *Hunt* involved cultivation of a garden in a vacant lot, with no clear fenced boundary.[21] In *Waldrip v. Olympia Oyster Co.*,[22] the court rejected a claim of adverse possession where the alleged possessor had paid taxes on the subject property but never made any actual use of it. In *Peeples*, the court stated that mooring a floating structure on tidelands is not open and notorious use.[23]

Here, there were a number of human-made objects or structures placed on the land in question. Building roads and storing a number of cars on a parcel of land indicates ownership. The use was sufficient to establish that it was open and notorious.

Palmer next claims that a number of the trial court's findings are not supported by substantial evidence. This challenge applies to the finding that the northern dirt road existed. It also applies to disputed evidence that the claimed activities establishing use of the parcel actually

---

[20]154 Wash. 42, 280 P. 935 (1929).

[21]8 Wn. App. 233.

[22]40 Wn.2d 469, 244 P.2d 273 (1952).

[23]93 Wn.2d 766.

occurred. We conclude that the trial court's findings are supported by the record.

Palmer argues that William Bryant's testimony that he put in a road along the northern boundary of Parcel 2A is not substantial evidence to support the trial court's finding that such a road constituted the northern boundary of the property possessed by Bryant. It is true that there was conflicting testimony regarding the existence of the road. But the testimony of the witnesses constitutes sufficient evidence on which the trial court could rest its findings. Bryant drew a line on an illustrative exhibit to show where he believed he cut the road. Daneel Kuzaro, Terri Bryant's friend, testified that she walked on the remnants of the road prior to trial and saw the markers for the Parcel 2A boundary.

Palmer challenges the ability of these witnesses to accurately locate the road. We will not disturb the findings of the trial court because they are supported by substantial evidence provided by the witnesses whose testimony we have summarized above.

Palmer also alleges that the record does not contain sufficient evidence to support the trial court's finding that the claimed activities took place on the entirety of Parcel 2A. The trial court's western boundary for Parcel 2A is based on the western clearing identified by Bryant. Bryant testified that he stored approximately 10 to 30 cars in this clearing. Terri Bryant also testified that her father kept cars in various locations on Parcel 2A. She noted two clearings where her father stored approximately 30 cars during the 1960s and 70s. She indicated that her father would take the family's "vicious" dog up into Parcel 2A "in the area where all these cars were" to deter theft. Bryant indicated the locations of other clearings with cars on exhibit 7. He testified that in the westernmost clearing he kept approximately 30 cars. We note that the trial court carefully distinguished the locations of the above activities from the absence of activity farther to the west. The court drew the western boundary line of Parcel 2A at

the point where Bryant had established adverse use. In so doing, the court determined there was insufficient evidence of activity farther to the west. There was substantial evidence to support the court's decision in this respect.

 Palmer challenges the trial court's finding that the aerial photographs it introduced at trial were inconclusive. This argument deals with the weight of the evidence. It is the trial court's function, not ours, to weigh the evidence. We will not disturb the trial court's finding because it is supported by substantial evidence.

 Palmer also assigns error to findings that state that the trial court concluded that Bryant's use of the property was "hostile" and without permission. But it cites no authority and fails to specify in the record anything to support its assignment of error. Therefore we need not consider the argument.[24]

## B

### Exclusive Use

Palmer argues that the trial court erred in finding that Bryant's use of the airstrip was exclusive. It argues that casual or incidental use by another defeats the claim of adverse possession here. Further, Palmer contends in its reply brief that Bryant's use of Parcel 2A was not exclusive because Palmer was at that time growing timber on the property and executed a mineral lease with respect to it.

Palmer reads the Washington cases to require absolute exclusion from the subject property. It therefore disputes the trial court's categorization of the use by others in this case as "incidental." We disagree with this argument.

 Our state Supreme Court has clearly stated that

---

[24]*Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808-09, 828 P.2d 549 (1992).

use must be similar to that of a true owner.[25] It affirmed a decision by this court that stated that while possession need not be absolutely exclusive to establish adverse possession, it must be possession of a type expected by an owner.[26]

Palmer argues that *Peeples*[27] stands for the proposition that a possessor must exclude the public. However, *Peeples* is distinguishable. In that case, the Port of Bellingham left the undeveloped tidelands it was claiming completely accessible by boat.[28] In this case, Bryant built the airstrip and expanded and maintained it over the years. Construction of an airstrip is a much clearer indication of ownership than leaving property undeveloped.

Palmer erroneously states that the courts have not recognized a category of incidental ownership. In *Crites v. Koch*,[29] this court held that where neighbors used a strip of the subject property as a shortcut and occasional parking strip, their use was too slight to render the claimant's use nonexclusive, where the claimant actively cultivated the property.

Cases where the courts have found a lack of exclusivity involve use by the title owner that indicates ownership. In *Thompson v. Schlittenhart*,[30] parties on both sides of a disputed boundary made similar use of the disputed property. In *Scott v. Slater*,[31] the title owner cultivated, sprayed, and harvested pears on the subject property.

Here, Bryant used the airstrip as a true owner would. Palmer does not challenge the trial court's finding that

---

[25]*ITT Rayonier*, 112 Wn.2d at 759.

[26]*ITT Rayonier*, 112 Wn.2d at 758 (quoting *ITT Rayonier v. Bell*, 51 Wn. App. 124, 129, 752 P.2d 398 (1988)).

[27]93 Wn.2d 766 (holding that where Port of Bellingham allowed public access by boat to undeveloped tidelands, there was no adverse possession).

[28]*Peeples*, 93 Wn.2d at 773.

[29]49 Wn. App. 171, 174-76, 741 P.2d 1005 (1987).

[30]47 Wn. App. 209, 212, 734 P.2d 48, *review denied*, 108 Wn.2d 1019 (1987).

[31]42 Wn.2d at 369.

Bryant had large X's painted on the runway in the mid-1970s to indicate to pilots that they should land there only in case of emergency, an action which is customarily recognized as a sign of ownership among pilots. While others used the airstrip, they did so with Bryant's consent.

Palmer contends that the trial court erred by finding that other pilots landed at the airstrip in accordance with customary use of private airstrips and that such use was incidental and with Bryant's express or implied permission. There is substantial evidence in the record to support the trial court's finding. At least two witnesses testified that it was a custom among private airstrip owners to allow pilots to land in case of emergency. There was testimony by a friend of Bryant's that he knew of three or four strangers landing at the strip over a period of 40 years. Bryant indicated that most people let him know why they were landing. But he did not know about the people who landed when he was not there. He estimated that 15 to 20 planes per year landed while he was not there. Given the custom among pilots, such use was incidental and with Bryant's express or implied permission.

Palmer also claims in its reply brief that it grew timber in Parcel 2 and granted a prospecting permit and surface lease to a mining company. Thus, Bryant's use was not exclusive. Palmer did not raise this argument in its opening brief. We will not consider an argument Palmer raises for the first time in its reply brief.[32]

The trial court found that the lease to the airstrip was abandoned in 1954. Palmer did not assign error to this finding. Therefore, it is a verity on appeal.[33] Accordingly, we need not consider whether the existence of the lease impacted the hostility element of Bryant's adverse possession claim.

---

[32]RAP 10.3(c).

[33]*Woodhead v. Discount Waterbeds, Inc.*, 78 Wn. App. 125, 131, 896 P.2d 66 (1995) (citing *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 433, 723 P.2d 1093 (1986), *review denied*, 128 Wn.2d 1008 (1996)).

There is no challenge to the actual and uninterrupted element of the adverse possession claim. We hold that Bryant established his claim to adverse possession of the surface rights of the parcels and the trial court did not err in its decision.

## II
### Adverse Possession of Mineral Rights

Bryant cross-appeals the trial court's determination that he did not establish adverse possession to subsurface mineral rights to the parcels. Palmer claims that Bryant may not now raise the question of mineral rights because he did not raise it at trial. We disagree.

Bryant commenced this action to quiet title. That is a claim to fee ownership, the most comprehensive type of ownership under Washington law.[34] The fee simple estate includes "all possible rights and privileges with respect to land."[35] This necessarily includes a claim to mineral rights as well as all other rights incidental to ownership of the fee.

Where there is no severance of the mineral estate, title to the mineral estate goes to an adverse possessor of the surface estate.[36] Severance that occurs after the prescriptive period begins to run does not interrupt the acquisition of adverse possession of the mineral rights.[37]

---

[34]WASHINGTON STATE BAR ASSOCIATION, REAL PROPERTY DESKBOOK § 5.3 (2d ed. 1986).

[35]2 THOMPSON ON REAL PROPERTY § 17.07, at 453 (David A. Thomas ed., 1994).

[36]*McCoy v. Lowrie*, 42 Wn.2d 24, 26-27, 253 P.2d 415 (1953) (holding that where there is severance of a mineral estate, the surface possessor may only adversely possess the mineral rights by establishing the elements of adverse possession separately with respect to those rights); 2 THOMPSON ON REAL PROPERTY, *supra* § 48.12(a).

[37]*Ates v. Yellow Pine Land Co.*, 310 So. 2d 772 (Fl. Dist. Ct. App. 1975), *cert. denied sub nom. Humble Oil & Ref. Co. v. Ates*, 321 So. 2d 76 (1975 Fla.); *Fadem v. Kimball*, 612 P.2d 287 (Okla. Ct. App. 1979); *Hurst v. Southwest Miss. Legal Servs. Corp.*, 610 So. 2d 374, 378-79 (Miss. 1992); *In re Petition of Doering*, 165 Vt. 603, 686 A.2d 101, 103 (1996).

The trial court decided that Bryant had failed to establish adverse possession to subsurface mineral rights to Parcel 1 and Parcel 2A. The court apparently based its decision on reservations in various deeds given over the years to Parcels A, B, and C.

We have carefully reviewed the record and conclude there is insufficient evidence to sustain the finding that reservations in the three deeds in the record before us that contain legal descriptions of Parcels A, B, and C are sufficient to show severance of the mineral rights to Parcels 1 and 2A. First, Parcels A, B, and C are not the same property as Parcel 2A. They lie to the east and south of that parcel. Thus, there is no substantial evidence in this record to show that reservations of mineral rights in deeds to the former group of parcels proves severance of such rights in Parcel 2A. Second, neither Parcel B nor Parcel C is the same property as Parcel 1. The latter parcel lies to the northeast of the two former parcels. Thus, a reservation of mineral rights in the first two parcels proves nothing about such a reservation in Parcel 1.

It is true that Parcel 1 lies within Parcel A. It is also true that a deed to Parcel A refers to a reservation in a deed dated 1895. But the 1895 deed was not in the record before the trial court and is not before us. There was therefore no way that the trial court could have determined from the record before it whether the 1895 deed related to Parcel 1 or some other part of Parcel A.

On appeal, Palmer asks us to sustain the trial court's decision on an alternate basis. Palmer argues that a 1953 deed that is in the record before us evidences a severance of mineral rights. This deed does not place Palmer in any better position and does not constitute substantial evidence that mineral rights were severed at the times critical to this case.

The deed Palmer uses to support its position conveyed a number of parcels of realty, some of which have nothing

to do with the parcels in dispute here. Near the end of the deed there are two references to rights of third parties. One reference is to rights to coal. The other is a more general reference to "reservations and exceptions contained in [a deed not in the record before this court]." Neither of these references is sufficient to show a severance of mineral rights prior to the relevant times *and* for the relevant properties, Parcel 1 and Parcel 2A. Moreover, the first reference to "coal" is narrower than "mineral rights." Finally, the second reference is too vague to constitute a reference to mineral rights. There was not substantial evidence that mineral rights had been severed. The trial court erred by concluding that Bryant did not also acquire subsurface mineral rights to Parcels 1 and 2A.

Palmer also argues that evidence that mineral rights were segregated for tax purposes establishes severance. It relies on tax records that the trial court excluded from evidence. Palmer also requests that this court take judicial notice of the records. We do not consider this argument.

First, Palmer did not assign error to the court's exclusion of the tax records. We therefore need not consider the argument.[38]

Second, although Palmer asks us to take judicial notice of the deeds under RAP 9.11, we decline to do so. The rule requires that the party requesting us to take judicial notice show six factors:

> (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.[39]

Palmer does not present any argument with re-

[38]RAP 10.3(a)(3).

[39]RAP 9.11.

spect to most of these factors. In any event, we decline to take judicial notice because, as a matter of law, segregation for tax purposes does not establish severance of the mineral estate.

Palmer cites *McCoy*[40] and *Gilbreath v. Pacific Coast Coal & Oil Co.*[41] in support of its argument. *McCoy* held that where there had been severance, but there was no segregation for tax purposes, the fact that the surface owner paid general taxes on the property and had color of title to the mineral estate did not confer title to the mineral estate on that owner.[42] *Gilbreath* applied the holding of *McCoy* to a similar situation.[43] These two cases do not stand for the proposition that if the mineral estate is segregated in the tax records, an adverse possessor may not successfully claim it. Palmer cites no other authority to support its contention.

We affirm the trial court's judgment that title to surface rights to Parcels 1 and 2A be quieted in Bryant. We reverse the judgment respecting mineral rights to these parcels and direct that title to those rights be quieted in Bryant.

The remainder of this opinion has no precedential value and will not be published.[44]

WEBSTER and ELLINGTON, JJ., concur.

Review denied at 133 Wn.2d 1022 (1997).

---

[40] 42 Wn.2d 24.

[41] 75 Wn.2d 255, 450 P.2d 173 (1969).

[42] 42 Wn.2d at 30-33.

[43] 75 Wn.2d at 257.

[44] RCW 2.06.040.