IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STEVE BERSCHAUER, | ) | |
| | ) | No. 35502-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON | ) | UNPUBLISHED OPINION |
| DEPARTMENT OF GENERAL | ) | |
| ADMINISTRATION and PUGET | ) | |
| SOUND ENERGY, INC., a Washington | ) | |
| State Public Utilities Corporation; FYI | ) | |
| PROPERTIES, a Washington nonprofit | ) | |
| corporation; and THE BANK OF NEW | ) | |
| YORK MELLON TRUST COMPANY, | ) | |
| NATIONAL ASSOCIATION, as Trustee | ) | |
| under Indenture of Trust Dated As Of | ) | |
| August 1, 2009, | ) | |
| | ) | |
| Respondents. | ) | |

SIDDOWAY, J. — Although he was partially successful in the trial court, Steve

Berschauer appeals the court's judgment (1) quieting title in the State to an 8.4 foot strip

of land he claims to own by adverse possession or as the result of a street vacation and (2)

summarily dismissing his prayer for an award of emotional distress damages for what the

court found was a merely technical trespass of his property. He also complains that the

trial court's award of a portion of his attorney fees and costs was insufficient and

unsupported by a required lodestar analysis. Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Well over a century ago, in 1883, T.I. and C.A. McKenny acquired land in the city

of Olympia. On January 23, 1884, they conveyed a parcel to Rebecca Hinchcliff, a

predecessor in title to the plaintiff, Steven Berschauer. On the same day, they conveyed a

parcel to the north to William J. Craig, a predecessor in title to the State.

Olympia had been originally platted 34 years earlier by Edmund Sylvester, who

laid out a grid of uniform blocks, streets and alleys that was followed by later developers,

subdividers, and sellers of land, at least in the case of properties relevant here.[1] The

McKennys' metes and bounds conveyances to Hinchcliff and Craig excluded strips of

land between and west of the Hinchcliff and Craig parcels that had been identified by

Sylvester as proposed streets. The McKennys thus retained title to the Sylvester-

proposed street property.

More than eight years after their conveyances to Hinchcliff and Craig, the

McKennys dedicated land that became part of Park Street, the proposed street running

---

[1] Br. of Appellant at 31 (citing *History of Olympia, Washington*, CITY OF OLYMPIA, http://olympiawa.gov/community/about-olympia/history-of-olympia-washington.aspx [https://perma.cc/822W-SGVQ]; Clerk's Papers (CP) at 1682 (unofficial plat of North Olympia obtained from the Washington State Archives), 1955 (Offut Addition to Olympia)).

east and west between the Hinchcliff and Craig properties, and Cherry Street, the proposed north-south street located west of their properties, "for the public use forever as highways." Clerk's Papers (CP) at 1776.

The land dedicated for Cherry Street was developed and used as a street, and the parcel owned by Mr. Berschauer, which he acquired from his father, was developed to face Cherry Street to the west. The land the McKennys dedicated for Park Street—later renamed 16th Avenue SE—was a gully and was not used for street purposes. *See* CP at 399 (In deposition, Mr. Berschauer testified, "You couldn't drive in there at all.").

In October 1961, Mr. Berschauer's father, Henry,[2] decided to build a residential fourplex on his parcel. Recognizing that the best building site would be next to or even within the easement for 16th Avenue SE, he successfully petitioned the city to vacate the street. The vacated area was 50.8 feet wide by 383 feet long. As a result of the vacation, Henry believed he owned title to the 25.4 feet of the vacated street south of its centerline by operation of law.

In 1965, Henry constructed the fourplex. A corner of the fourplex overlapped the vacated street by two feet, and a foundation wall extended five feet further into the former street easement.

---

[2] We refer to the appellant as Mr. Berschauer and for clarity, refer to his father as Henry. We intend no disrespect.

3

In 1968 and 1969, the State of Washington purchased two parcels to the north of vacated 16th Avenue SE for the purpose of having Puget Sound Energy (PSE[3]) construct a substation for the State Capitol campus. It would later quit claim the west parcel to PSE. In 1969, to enable PSE to construct the substation, the State placed fill in the gully in the vacated street area and the adjacent hillside. In 1969 or 1970, PSE improved the western end of the vacated street, creating a graded gravel area that provided access to the substation and was used as a parking and staging area. The improvement created a roughly 34 foot wide gravel area (113 feet long) that extended approximately 8.4 feet south of the vacated street's centerline—in other words, 8.4 feet in width of the gravel area was on what Henry assumed had become his property. According to Mr. Berschauer, Henry approved the grading and gravel placement. Mr. Berschauer admitted in deposition that PSE used the gravel area "all the time," had been using it for "a long time," and sometimes used its entire width, "depend[ing] on the amount of vehicles" it was using. CP at 1029-30.

Over time, Henry or Mr. Berschauer planted trees and placed beauty bark and a drain pipe on the portion of vacated 16th Avenue SE south of the PSE-improved gravel area. The result was a 17 foot wide, 120 foot deep landscaped expansion of the fourplex grounds. Title to the property owned by Henry passed to Mr. Berschauer in 1996.

---

[3] "Puget Power" at the time.

4

Decades later, in 2009, the State began to plan construction of a large office building on the State Capitol campus. The project involved over a dozen parcels and multiple ownerships, prompting the State to seek a boundary adjustment consolidating the land into four larger parcels. Among the parcels involved was the State's parcel north of the Berschauer parcel and east of the parcel the State had conveyed to PSE. As part of the project's design, the existing access to the State land would be closed and the city would require the State to demonstrate a 28 foot wide replacement access. The State assumed it could provide the required 28 foot access through its 25.4 foot strip north of the centerline of vacated 16th Avenue SE and an easement to the west and several feet to the south. Like Henry and Mr. Berschauer, State employees assumed that as an owner of abutting property, the State's predecessor had acquired title to half of vacated 16th Avenue SE.

A survey consultant was engaged by the State to manage the research of property ownership and survey issues. After examining title documents, the consultant came to the conclusion that the State probably did not have fee title to the north half of vacated 16th Avenue SE. As Kathleen Cassou, the consultant's employee assigned to the research concluded, "The fact that the dedication in 1892 recited that the McKennys held the vested fee interest in the future Park Street area confirmed they had not conveyed (either explicitly or impliedly) one half of their fee interest in that future street area to the owners of the north and south parcels some 8 years earlier." CP at 1905. She concluded

5

that title to the vacated street was held by the heirs or assigns of the McKennys. Because the identity of the heirs or assigns was unknown, Ms. Cassou suggested filing a quiet title action, with the objectives of either identifying the successor owner(s) or, if they could not be identified, initiating an escheat action.[4]

Instead, state employees, with the help of a title company, identified Susan Hill Bergeson, in her capacity as the personal representative of an estate, as the successor to fee title to the vacated street. For consideration of $2,500, the State obtained a quit claim deed to Cherry Street and the vacated 16th Avenue SE from Ms. Bergerson on July 7, 2010. Through the quit claim deed, the State obtained record title to whatever Ms. Bergerson could convey, which satisfied the city that the 28 foot access was available. The State took no action to challenge Mr. Berschauer's or his tenants' use of the 17 foot wide area north of Henry's original property line that the Berschauers had landscaped.

---

[4] Mr. Berschauer makes much on appeal of an internal e-mail chain among state employees involved in the office building project in which Stefanie Fuller, a property and acquisition specialist, stated that to file an action to quiet title would be "ethically and morally wrong," and that what the State should be doing was negotiating to buy whatever additional land or easement was needed from Mr. Berschauer. CP at 1176. It is apparent from the e-mail chain that Ms. Fuller was under the impression, earlier shared by other state employees, that by operation of law, Henry and the State's predecessor had each acquired title to half of the street property upon vacation.

By the time of the summary judgment proceedings, Ms. Fuller had a better understanding of the basis for Ms. Caussou's opinion and accepted it. *See* CP at 1917. Since there is nothing to suggest that this was not a good faith change in Ms. Fuller's understanding and belief, we attach no importance to her earlier expression of a different view.

6

In 2011, Ms. Cassou used the quit claim deed along with other materials to obtain city approval for the State's application for a boundary line adjustment and replat of its lots. As part of that process, she had survey technicians mark the corners of the replatted parcels. The corners were marked by the technicians in July 2010 using stakes with orange rubber caps, which sat flush to the ground. It was the survey technicians' placement of these stakes that was the first indication to Mr. Berschauer that there might be an issue with what he had believed was his north property line. Since the replatted lots would include the entire south half of vacated 16th Avenue SE as State property, the capped stakes marked a boundary line that cut through a corner of Mr. Berschauer's fourplex.

Mr. Berschauer testified in deposition that the stakes did not concern him initially, but did cause him to contact a surveyor and then a title agent, who informed him the State had obtained and recorded a quit claim deed describing the entire vacated street. This later information is alleged by Mr. Berschauer to have caused him stress and stress-related complications that led him to be hospitalized on several occasions.

In December 11, 2013, Mr. Berschauer filed the complaint in the action below, asserting claims for slander of title, trespass, ejectment, inverse condemnation, and to quiet title. In the State's answer, it conceded that the Berschauers had acquired title by adverse possession to the portion of vacated 16th Avenue SE they had improved with landscaping.

7

The parties engaged in a series of cross motions for summary judgment over the next couple of years. In connection with the motion activity, the State agreed in September 2015 that it would no longer contest Mr. Berschauer's ownership by adverse possession of the entire strip of land lying 17 feet north of the south boundary of vacated 16th Avenue SE, filing a map to illustrate the scope of its concession. The cross-hatching on the following modified portion of the State's depiction illustrates the south 8.4 feet of the PSE-improved gravel area that remained in dispute:



See CP at 1431.

In rulings on the parties' motions, the trial court granted summary judgment to Mr. Berschauer on his trespass claim, finding a technical trespass but dismissing his claim for emotional distress damages; dismissed Mr. Berschauer's claims to ownership of the disputed 8.4 foot strip and quieted title to that strip in the State; and granted Mr.

8

Berschauer's motion for attorney fees as the prevailing party in a claim for adverse

possession, but awarded only $10,000.00 in fees and $240.00 in costs rather than the

$66,691.75 in fees and $2,474.13 in costs Mr. Berschauer had requested.

Mr. Berschauer appeals.

## ANALYSIS

Taking Mr. Berschauer's assignments of error somewhat out of order, we first

address whether the trial court erred in ruling that upon vacation, title to 16th Avenue SE

reverted to the McKennys' heirs (assignments of error 2 and 3); turn second to whether

the trial court erred in granting summary judgment quieting title in the State to the

disputed 8.4 foot strip (assignment of error 1); turn third to whether the trial court erred in

dismissing his prayer for an award of emotional distress damages for trespass

(assignments of error 4, 5 and 6); and turn last to his contention that the award of a

portion of his attorney fees and costs was insufficient and unsupported by a required

lodestar analysis.

The court's substantive rulings were all by way of summary judgment. We review

a grant of summary judgment de novo. *Keck v. Collins*, 181 Wn. App. 67, 78, 325 P.3d

306 (2014), *aff'd*, 184 Wn.2d 358, 357 P.3d 1080 (2015). Like the trial court, we review

all facts and reasonable inferences in the light most favorable to the nonmoving party.

*Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

9

### I.  *Passing of title on street vacation*

Unless specifically controlled by statute, the abandonment, relinquishment or vacation of a dedicated street causes title to revert to the dedicator or those claiming under the dedicator.  6 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK SERIES: LAND USE DEVELOPMENT § 3.12(3) at 3-29 (4th ed. 2016) (citing *Johnston v. Medina Improvement Club, Inc.*, 10 Wn.2d 44, 56-57, 116 P.2d 272 (1941)).  When 16th Avenue SE was vacated in 1961, the effect of vacation on title was governed by former Remington's Revised Statutes sections 9299 and 9300 (1901), presently codified at RCW 35.79.040 and .050.  Under the two statutory provisions, upon vacation "the property . . . so vacated shall belong to the abutting property owners, one-half to each," subject to a challenge procedure not relevant here, and subject to the further limitation that "[n]o vested rights shall be affected by the provisions of this act." *Id.*

In *London v. City of Seattle*, 93 Wn.2d 657, 666-67, 611 P.2d 781 (1980), our Supreme Court addressed the right of an abutting owner who acquired title before a dedication of property as a public street.  It explained that the default statutory rule in favor of the abutting property owners "is based on the presumption that the abutters or their predecessors, *prior to dedicating the land for street purposes*, originally owned the underlying fee to the center of the street," and continued:

> The general rule, however, is subject to control by the particular
> circumstances of the case when one abutting owner is shown to have had
> no fee interest in the street and another the entire fee therein.  In that

10

instance, the abutter that had no underlying fee interest does not take to the center of the street upon its vacation. *See, e.g., Rowe v. James*, 71 Wash. 267, 128 P. 539 (1912).

Here, London never possessed the underlying fee to any part of East James Street. *She acquired her property before this portion of East James Street was dedicated by PMC*[5] *in 1963.* RCW 35.79.050 mandates that vested rights are not to be affected upon street vacation. *See Taft v. Washington Mut. Sav. Bank*, 127 Wash. 503, 221 P. 604 (1923). Here, the evidence is that the fee to the entire width of East James Street rested in PMC. We agree with the trial court that upon vacation of the street and extinguishment of the public easement, title to all of East James Street remained vested in PMC.

*Id.* at 666-67 (emphasis added).

In this case the Berschauers' and the State's predecessors, Hinchcliff and Craig, respectively, never owned the underlying fee to the center of the street. The language of the street dedication indicates that at the time it was executed in 1892, the McKennys were the owners in fee simple of the subject land. The metes and bounds descriptions of the property conveyed in their earlier deeds to Hinchcliff and Craig confirm that the McKennys retained title. Where a dedicated street is wholly within the boundary of the dedicator's land, and the dedicator owns no property outside that boundary, "title to the vacated street vests solely with the dedicator or his devisees." *Christian v. Purdy*, 60 Wn. App. 798, 801, 808 P.2d 164 (1991). "Abutting owners on the other side of the vacated street have no underlying fee interest under such circumstances and thus do not take to the center of the street on its vacation." *Id.*

---

[5] Providence Medical Center (PMC).

Cases on which Mr. Berschauer relies do not help him. Like this case, *Humphrey v. Krutz* involved an owner of property who conveyed parcels on either side of a 10 foot strip by metes and bounds descriptions that excluded the strip. 77 Wash. 152, 154, 137 P. 806 (1913). But unlike the unused 50.8 foot strip retained by the McKennys in this case, the court found that from the time of its fencing in 1888, the 10-foot alley in *Humphrey* was used continuously as a public highway, giving rise to prescriptive rights in the public if the use was without consent, and a parol dedication if the use was with consent. *Id.* at 154-55. "[The owners] *then* sold all the property abutting upon both sides of the strip." *Id.* at 154 (emphasis added). Also unlike this case, the only relief requested by the abutters in *Humphrey* was to enjoin the threatened obstruction of the alley. *Id.* at 153. To the extent the opinion touches on ownership, it is dicta.

*McConiga v. Riches*, 40 Wn. App. 532, 539, 700 P.2d 331 (1985) is even more distinguishable, because there the property had been platted before parcels were sold, and the parcels were sold by lot number. If a dedicator sells property abutting streets and alleys dedicated on the face of a plat, it is presumed that it intended to sell to adjoining property owners the fee in the streets and alleys to the centerline. *See Bradley v. Spokane & Inland Empire R.R. Co.*, 79 Wash. 455, 459-60, 140 P. 688 (1914).

The consultant's analysis of title, accepted by the State, proves correct. Although Mr. Berschauer, his father, and state employees initially assumed that title to the vacated

12

street had passed to the abutting owners, it proved not to be the case. Summary judgment in favor of the State on this issue was appropriate.

## II. *Adverse possession*

Although Henry did not acquire title to the south half of 16th Avenue SE upon vacation, his belief that he owned it led him to develop and use a portion of the property for a period of years giving rise to title by adverse possession. The State conceded that he made the type of use of 17 feet north of his original property line to give rise to title through adverse possession. With respect to the south 8.4 foot strip of the PSE-improved gravel area, however, the facts were undisputed that the area was not needed for access to or development of the fourplex, which faced on Cherry Street. Henry, Mr. Berschauer and their tenants only occasionally used the gravel area north of the duplex side yard for parking, pothole filling, and litter pickup. It was undisputed that PSE more regularly used the gravel area, including its south 8.4 feet.

Mr. Berschauer nonetheless argues that evidence supported the Berschauers' "penumbral possession" of the south 8.4 feet of the gravel area as adjoining property reasonably necessary to accomplish Henry's objective for the portion of the vacated street that he, and later Mr. Berschauer, improved and actively used. He argues that his father's reasonable belief that he owned the entire south half of the street informs the analysis of penumbral possession.

13

To establish a claim of adverse possession, a party's possession of property must be: (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile and under a claim of right made in good faith. *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984). All of these elements must exist concurrently for at least 10 years. RCW 4.16.020. Adverse possession is a mixed question of law and fact. *Id.* at 863. The trier of fact resolves any factual disputes, but the court determines whether the facts found constitute adverse possession. *Id.* Here, material facts were not disputed.

"An adverse possessor need not enclose the claimed parcel." *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 212, 936 P.2d 1163 (1997). Boundaries may be defined by the use of the property. *Id.* And possession may extend beyond areas actually possessed if the claimant meets the elements for penumbral possession. *State v. Stockdale*, 34 Wn.2d 857, 863, 210 P.2d 686 (1949), *overruled on other grounds by Chaplin*, 100 Wn.2d 853. A claimant has made a showing of penumbral possession when he shows that an area is "reasonably needed to carry out his objective." *Id.* at 863.

Mr. Berschauer likens his father's objective and need for the disputed 8.4 feet of ground to the objective and need presented in *Stockdale*. In that case, the state park committee purchased an area of land for what later became Gingko State Park in Kittitas County. *Id.* at 858-59. Both the grantor and grantee intended the boundary of the land conveyed to coincide roughly with the edge of a cliff overlooking the Columbia River. It was discovered years later that a metes and bounds description was needed to capture 10

14

acres of land located between a subdivision line and the cliff, and the deed signed by the grantor erroneously described the land conveyed as stopping at the subdivision line. *Id.* at 859. Meanwhile, the State had built a museum that encroached on the 10 acres and it later constructed a laboratory shop, a garage, and a glass-enclosed vista room overlooking the river as well as a walkway along the museum and a guard rail at the edge of the cliff. *Id.* When the State's claim to adverse possession of the 10 acres was ultimately litigated, the successor in title to the 10 acres argued that the State had acquired title by adverse possession to, at most, the land on which it had built. *Id.* at 862.

The Supreme Court rejected that argument, concluding that "[t]he purpose for which possession of the ten-acre tract was taken was to construct and maintain a museum and residence of a caretaker, and make such other improvements as were proper and needed to carry out the general park plan of the [State]." *Id.* at 863. The court held that the State had acquired title to the entire 10-acre tract by adverse penumbral possession because the area was "reasonably needed to carry out [the State's] objective." *Id.*

The State's conduct in *Stockdale* provided evidence of its reasonable need for the 10 acres that is not present here. First, the fact that the State intended to buy the 10 acres is itself evidence that those 10 acres were part of its park plan. Here, by contrast, a legal avenue by which Henry could acquire land in the street easement was by petitioning for vacation, whether he needed a full 25.4 feet or not—and most of the land he expected to acquire by vacation was an unusable gully. He believed he would acquire title to the

15

centerline, but that does not inform the analysis of penumbral rights, because petitioning to vacate tells us nothing about his development objective other than that he needed at least *some* additional land.

Second, in *Stockdale* it was consistent with park planning in general and with improvements later made that the State wanted a view corridor to the Columbia River and parkland across which visitors could walk up to the guard rail-protected cliff line. The only need one might infer from Henry's plans was that he needed an additional 2 feet for a corner of the fourplex, another 5 feet for the foundation wall, and the legally-required 10 foot side yard setback—a total of 17 feet.

The trial court properly granted summary judgment to the State on the issue of title by adverse possession.[6]

### III. *Emotional distress damages*

Mr. Berschauer next contends the trial court erred when it dismissed his prayer for an award of emotional distress damages for his trespass claim. The trespass at issue is

---

[6] Since we reject the argument that Mr. Berschauer presented evidence supporting a genuine issue of penumbral rights, we need not reach the State's further arguments that he failed to demonstrate the essential elements of uninterrupted and exclusive use of the south 8.4 feet of the gravel area.

the survey technicians' July 2010 placement of a survey stake within the property whose

title the Berschauers acquired by adverse possession.[7]

Relying on the *Restatement (Second) of Torts*, our Supreme Court has held that

"'[o]ne is subject to liability to another for trespass, irrespective of whether he thereby

causes harm to any legally protected interest of the other, if he intentionally

> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.'"

*Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 681, 709 P.2d 782 (1985),

quoting RESTATEMENT (SECOND) OF TORTS § 158 (AM. LAW INST. 1965). "Trespass is a

strict-liability tort, so that even entry under a belief that the intruder owned the premises

may constitute a trespass." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER,

WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 10.2 (2d ed. 2004).

---

[7] In his reply brief, Mr. Berschauer argues that the State oversimplifies his trespass claim by focusing only on the survey technicians' placement of the stake. Reply Br. at 13-14. We refuse to consider Mr. Berschauer's asserted "second" basis for his trespass claim for two reasons. First, if we understand the claim, the basis for it evaporates with our decisions on the first two issues. Second, the trial court made clear to Mr. Berschauer that it did not view a second trespass claim as pleaded by his complaint and any different trespass claim needed to be raised by a motion to amend. Report of Procedings (Nov. 6, 2015) at 39-40. We agree with the trial court that any second trespass claim was not sufficiently pleaded by Mr. Berschauer's complaint. No motion to amend was pursued.

17

"[T]he tort of trespass is complete upon a tangible invasion of plaintiff's property, however slight." *Bradley*, 104 Wn.2d at 685. The *Restatement (Second)*'s position on recoverable damages is that a trespass on land subjects the trespasser to liability for physical harm to the possessor of land at the time of the trespass. RESTATEMENT (SECOND) OF TORTS § 162 (AM. LAW INST. 1965). Cases from other jurisdictions have held that recoverable damages include mental suffering and its physical consequences, while emphasizing that the injury must be directly and proximately the result of the trespass. *E.g.*, *Wheeler v. Cmty. Fed. Sav. & Loan*, 702 S.W.2d 83, 86 (Mo. Ct. App. 1985); *Costlow v. Cusimano*, 34 A.D.2d 196, 201, 311 N.Y.S.2d 92 (1970); *Lesch v. Great N. Ry. Co.*, 106 N.W. 955, 957 (Minn. 1906). Sample (not pattern) jury instructions set forth in the *Washington Practice Series* assume that damages for emotional distress proximately caused by an intentional trespass are recoverable. *See* sample instructions 18 and 20, 29 WASHINGTON PRACTICE, WASHINGTON ELEMENTS OF AN ACTION § 27:11 (2016-17 ed.).

The State nonetheless argues that Washington courts have only affirmed awards of emotional distress damages in cases of "willful" trespass. The four cases it cites for

support are all distinguishable.[8] More persuasive is the State's argument that we can

affirm summary judgment on the basis that Mr. Berschauer failed to present evidence

creating a triable issue that his stress and hospitalization were proximately caused by the

survey mechanics' placement of the stake.

---

[8] In *Nordgren v. Lawrence*, the earliest decision cited by the State, the defendant challenged the plaintiff's recovery of mental distress damages resulting from a trespass, and the Supreme Court stated that "mental suffering may be taken into consideration in assessing damages, where the same is a result of a wrongful act." 74 Wash. 305, 308, 133 P. 436 (1913). The Court did not say that a "wrongful" act is a "willful" act or suggest that some trespasses may not be "wrongful."

*Birchler v. Castello Land Co.* addressed whether the trebling of the stumpage value of severed trees under the timber trespass statute, RCW 64.12.030, was an exclusive remedy or whether emotional distress damages were also recoverable. The Supreme Court found no reason to believe the statute was intended to subsume all claims for relief that may exist in conjunction with a timber trespass, which is an intentional tort, and observed that "the recovery of emotional distress damages in cases of intentional torts is consistent with the modern rule." 133 Wn.2d 106, 116-17, 942 P.2d 968 (1997). Although Washington cases have long held there must be an element of willfulness on the part of the trespasser to support treble damages under the statute, *e.g., Herring v. Pelayo*, 198 Wn. App. 828, 834, 397 P.3d 125 (2017), it was the fact that a statutory violation requires at least intentional conduct that explained the court's decision that emotional distress damages are recoverable.

*Pendergrast v. Matichuk*, 186 Wn.2d 556, 379 P.3d 96 (2016) addressed an issue unresolved by *Birchler*, of whether emotional distress damages proved in a statutory timber trespass case should be trebled. In construing the statute to require the trebling of all recoverable damages including those for emotional distress, the court did not distinguish between intentional and willful conduct.

The reasoning in *Birchler* was applied to a different statute that provided a remedy for mobile home tenants whose landlord acted unreasonably when denying consent to a tenant's lease assignment in *White River Estates v. Hiltbruner*, 134 Wn.2d 761, 953 P.2d 796 (1998). Because acting "unreasonably" is akin to negligence rather than intentional wrongdoing, the Supreme Court held that the statute—which was silent as to whether emotional distress damage could be recovered—could not be construed as providing for such recovery.

When deposed, Mr. Berschauer testified as follows about his reaction to placement of the stake on July 7, 2010:

> Q.    . . . The peg with the "X" through it, on the west, what did that tell you? You saw that and you drew some conclusion from that?
> A.    Explain that, again?
> Q.    Well, you saw that in July of 2010?
> A.    Correct.
> Q.    And in some way, you reacted to it; correct?
> A.    Not right away, kind of, you know.
> Q.    Okay.
> A.    And then, later, we did.
> Q.    Okay. So what did you think right away, when you saw it?
> A.    I didn't.
> Q.    You didn't? Okay. When did, when did this concern arise as to what that was all about?
> A.    Maybe six months after it was done, maybe even less.
> Q.    And what was it that arose to the level of a concern?
> A.    Well, I didn't really pay much attention to it, other than I saw [a surveying firm] there and saw they had done that engineering, and then they did this engineering here, too, and they also did this other stuff when they were there.

CP at 1604. Mr. Berschauer testified that after "a while" he decided to consult a surveyor who had done work for his father and inquire about the significance of the stakes, "[a]nd then, later" he talked to a woman from a title company. *Id.* at 1604-05. Asked to place a time frame on when he started to feel the stress that sent him to the hospital, Mr. Berschauer testified it was "months" later,

> Q.    So early 2011? Mid 2011?
> A.    I'd say, maybe, early. When did we first start, start this, 2010 what? I'd say, I don't know, six months after when we first started, 2010 or whatever.

20

No. 35502-1-III
*Berschauer v. Dep't of Gen. Servs., et al.*

CP at 1605.

Proximate cause has two elements: cause in fact, which refers to the "but for" consequences of an act, and legal cause, which "rests on policy considerations as to how far the consequences of defendant's acts should extend." *Hartley v. State*, 103 Wn.2d 768, 778-79, 698 P.2d 77 (1985). "[L]egal causation is for the court to decide as a matter of law." *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). The trial court is the gatekeeper and can dismiss an action without trial for lack of legal cause if the defendant's actions are too remote a cause of the plaintiff's injuries. *McCoy v. Am. Suzuki Motor Corp.*, 136 Wn.2d 350, 360, 961 P.2d 952 (1998).

We agree with the observation of a New York court that "since the tort of trespass is designed to protect interests in possession of property, damages for trespass are limited to consequences flowing from the interference with possession and not for separable acts more properly allocated under other categories of liability." *Costlow*, 34 A.D.2d at 201. Missouri courts have wisely held that damages for mental anguish should be recoverable in a trespass action only when they are a "'direct and immediate'" result of the trespass and "'not merely consequential.'" *Wheeler*, 702 S.W.2d at 86 (quoting *Mawson v. Vess Beverage Co.*, 173 S.W.2d 606, 613 (Mo. Ct. App. 1943). As a matter of logic, common sense, justice, and policy, a surveyor's trespass that causes no immediate or direct injury and merely proves to be the first indication of what becomes a distressing property

21

dispute is too remote a cause to support liability. The request for an award of emotional distress damages was properly dismissed.

## *IV. Attorney fees*

Finally, Mr. Berschauer challenges the trial court's award to him of only $10,000 in attorney fees. He had requested attorney fees under RCW 7.28.083(3), which provides that the prevailing party in an action asserting title to real property by adverse possession may request an award of costs and attorney fees, and that "[t]he court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just."

In support of his motion for an award of fees, Mr. Berschauer submitted his lawyer's declaration and billing records, asserting that $119,188.50 in fees and $5,087.23 in costs related at least in part to the adverse possession claim and a prescriptive easement counterclaim. The lawyer explained that he "attempted" to segregate fees relating to "claims of prescriptive rights," but

> Most of the time entries do not specifically segregate time spent on prescriptive claims from time spent on other claims. Because of the nature of discovery and mixed-issue motions, it would not have been possible to do so in the original billing records. The issues were often intertwined.

CP at 116.

Instead, the lawyer separated the fees into five categories and requested percentage awards: 33.3 percent of general billings involving multiple claims, 50 percent of billings

22

related to the first round of summary judgment motions, 80 percent of billings related to the third round, 66.7 percent of billings related to the fourth round, and none of the billings that were clearly unrelated to prescriptive claims. Based on his categorization and percentage allocations, he requested an award of $66,691.75 in attorney fees and $2,474.13 in costs.

At the hearing of the attorney fee motion, the trial court stated that what it "really want[ed] to focus on [were] the equitable issues, which is whether an award of fees would be just and equitable." Report of Proceedings (Sept. 2, 2016) at 26. It explained that it had reviewed the history of the parties' positions during the demand and litigation stages and, "Given everything that I can see in the record, including the motion practice, what happened and when, when agreements were made, when concessions were made, I think an award of $10,000 in attorney fees is appropriate, and I am going to award that to Mr. Berschauer." *Id.* at 28.

We will uphold an attorney fee award unless we find the trial court manifestly abused its discretion. *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007). Mr. Berschauer argues that the trial court abused its discretion by refusing to base its fee award on a lodestar analysis, citing *Mahler v. Szucs*, 135 Wn.2d 398, 433, 957 P.2d 632, 966 P.2d 305 (1998) ("[C]ourts should be guided in calculating fee awards by the lodestar method."). We note that the relatively recently-enacted statute authorizing an award of fees and costs in adverse possession cases provides trial courts

23

with uniquely broad discretion. But it still speaks of "reasonable attorneys' fees," and our Supreme Court mandates the use of lodestar data and methodology in determining what is reasonable. RCW 7.28.083(3); *Mahler*, 135 Wn.2d at 434. Moreover, even where the trial court is given broad discretion, its decision is reviewable for abuse of discretion, and lodestar data and analysis provides an adequate record for review. *Id.* at 435.

Under this unique fee statute, the lodestar analysis should be used to arrive at the "reasonable fees" starting point, but the trial court then has discretion to "award all or a portion" of those fees based on what it determines to be "equitable and just." RCW 7.28.083(3). Given the lack of specificity in Mr. Berschauer's law firm's time entries, we perceive nothing more the trial court could have done by way of lodestar analysis to arrive at that starting point than what it did do: look at the lawyer's estimate (arguably his "guesstimate") and the State's criticisms. It would have been impossible for the trial court to critically review and adjust the too-vague time entries.

It was therefore appropriate for the trial court to note Mr. Berschauer's requested amount of fees and costs, the State's criticisms, and then proceed as it did to what was "equitable and just." Mr. Berschauer does not demonstrate a manifest abuse of discretion. Given the State's initial and later concessions on the adverse possession issue and Mr. Berschauer's unsuccessful positions, the award made by the trial court was within the range of outcomes that could reasonably be found equitable and just.

24

No. 35502-1-III
*Berschauer v. Dep't of Gen. Servs., et al.*

## V.    *Attorney fees on appeal*

Both parties request an award of attorney fees on appeal under RCW 7.28.083(3). The State prevails and its request was adequately called out in a separate section of its brief, with citation to a statute that obviously applies.  No more is required by RAP 18.1(b).  We award reasonable fees and costs on appeal to the State subject to its compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, A.C.J.

25