

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| ROBERT SYDOW, an individual, | ) | |
| | ) | No.  40537-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| DOUGLASS PROPERTIES LLC, a | ) | |
| Washington limited liability company, | ) | |
| | ) | |
| Respondent. | ) | |

STAAB, C.J. — This appeal concerns a boundary dispute over a strip of land north of the deeded boundary line between adjoining parcels in Spokane County (the disputed property).  Robert Sydow constructed a fence that enclosed the disputed property with his yard to the south.  From 2008 until 2020, he used and maintained the fenced-in disputed property as part of his property.  After acquiring the adjoining parcel, Douglass Properties LLC (Douglass) entered the disputed property in 2020 and razed Sydow's fence and other improvements.

Sydow filed a complaint against Douglass, asserting that he owned the disputed property by adverse possession and seeking to quiet title.  Sydow also raised tort claims of trespass, timber trespass, negligence, and negligent infliction of emotional distress.  On

cross motions for summary judgment, the superior court denied Sydow's motion on his

adverse possession claim and granted Douglass's motion dismissing all of Sydow's

claims. Sydow appealed from both orders.

We conclude the undisputed evidence establishes that Sydow obtained title to the

property by adverse possession as a matter of law. We therefore reverse the order

granting summary judgment in favor of Douglass, reinstate all of Sydow's claims, reverse

the denial of Sydow's partial summary judgment motion, and remand with instructions to

grant Sydow partial summary judgment on his claim of adverse possession. As the

prevailing party in an action asserting title by adverse possession, Sydow will be entitled

to his reasonable attorney fees and costs under RCW 7.28.083, to be determined by the

trial court.

## BACKGROUND

This case arises from a boundary dispute between adjacent parcels in Spokane

County. The properties in question were originally part of a 16.6 acre parcel owned by

Medar Properties Washington LLC (Medar). Medar was owned and managed by

members of the Sydow family, including Sydow's mother. For a period of time Robert

Sydow owned a 2.5 percent nonvoting, "non-member" interest in Medar.

A manufactured home occupied a portion of the southwest corner of the parcel.

The record is unclear on whether the small lot occupied by the manufactured home was

fully enclosed by fencing, but there was fencing on the south, west, and east sides of the

2

home. In 2005, Medar permitted Sydow to move into the manufactured home. Medar sought a buyer for the remaining portion of the parcel, anticipating that the mobile home and approximately two acres surrounding it would be split off and transferred to Sydow.

Later that year, Medar entered into negotiations to sell the remaining portion of the parcel to Star Saylor Investments LLC (Saylor). During negotiations, Medar made clear to Saylor and its counsel that the manufactured home and the two acres it occupied were not part of the sale.

In 2006, Medar instructed Sydow to mark the north boundary of the property he wanted to keep, giving him approximately two acres of property. Sydow then constructed a fence to mark his northern property line (the Sydow property). The area enclosed by the fence was sentimental to Sydow. It included several long-held family memorials and trees where, notably, his mother's ashes were later spread. On one of the trees within the fence, Sydow's sister built a perch to observe golfers. Sydow's mother would sit near the trees to observe wildlife and would set dishes with water out for wildlife to drink.

As sale negotiations between Medar and Saylor continued, the location of the northern fence installed by Sydow became a point of contention. Both Medar and Saylor took issue with the fence's placement, believing it had been placed 60 feet north of the originally intended property line. Medar's counsel sent a letter to Sydow, pointing out that Sydow's mother expected Sydow to move the fence a few feet, not 60 feet. The

3

letter also advised that Saylor did not agree to the relocated fence, and while it was not demanding the immediate relocation of the fence, Saylor may require relocation if alternative resolutions are not agreed upon. As a result, Sydow hired counsel to assist him in defending his interest in the disputed property. Sydow's attorney wrote to Medar asking if the size of the parcel being sold to Saylor had been established and expressing Sydow's preference to leave the north fence where it was built. Medar's attorney wrote to Sydow's attorney that Medar was "arranging for the relocation of the fence so as to bring it into compliance with my letter to [Saylor]. Please do not hinder these people in their task of correcting a problem created by you." Clerk's Papers (CP) at 388.

After numerous letters were exchanged, Medar sent a final offer to Sydow. Within the offer, Medar indicated that it would move the north fence approximately 50 feet south of its current location. Sydow was advised that after the sale closed, Sydow would receive a deed to the parcel enclosed by the relocated fences in exchange for his ownership in Medar. Sydow signed and accepted Medar's offer after Medar threatened legal action to evict Sydow. However, the northern fence was never moved by Medar or Sydow.

In August 2008, Medar's counsel emailed Sydow's counsel, informing him that the transaction with Saylor was close to going through following completion of the "lot line adjustment." CP at 410. The letter also demanded that Sydow cease and desist harassing workers hired to conduct the lot line adjustment and to clean up the property.

Two months later, Medar applied to segregate the parcel into two parcels: the

Sydow property, described as 1.76 acres, and what would later become the Douglass

property, described as 14.84 acres. The rough size and shape of the parcels as legally

described are shown below:



Resp't's Br. at 3.

A surveyor hired by Medar surveyed the parcel and placed boundary monuments

marking the boundary line between the two parcels. Those monuments included a rebar

pipe capped with the note "PLS 36830" where the southwest corner of the (now)

Douglass property met the northwest corner of the Sydow property. The boundary

between the parcels extended east from that point 213.01 feet. A draft of the survey was

filed with the segregation application identifying the boundary monuments. The

certificates of exemption for each parcel used the legal descriptions from the draft survey,

not the boundary of the physical fence line. In January 2009, Medar recorded a final survey that matched the draft survey and confirmed the same eastern boundary monument.

Following segregation, on October 27, 2008, Medar quitclaimed what would become the Douglass property to itself and quitclaimed the Sydow property to Sydow. Both recorded deeds contain the same legal descriptions as those in the segregation application and the survey.

Sydow entered into a written "Redemption Agreement," exchanging his interest in Medar for title to the Sydow property. The Redemption Agreement used the same legal description from the segregation application and survey. Around one year later, in 2009, Medar conveyed the Douglass property to Saylor.

Despite its incongruence with the legal descriptions, the 2006 fence stayed in place until 2020. Neither Medar nor Saylor moved the fence, nor did they contact Sydow regarding it. During those approximately 13 years, Sydow thinned a densely treed area on the disputed property, created habitats for local wildlife, created a pet cemetery and family memorials, mowed and maintained the land, and set up chairs for wildlife viewing. Sydow also had an electrical connection established so that he could install wildlife cameras on the property and electrify portions of the northern and eastern fences. Additionally, he posted "No Trespassing" and "Security Cameras in Use" signs on the fence and trees on the property.

6

In July 2017, Douglass signed a "purchase and sale agreement" to buy the vacant property from Saylor. In December 2017, Douglass retained a firm to perform engineering and surveying work for a proposed apartment complex on the property. The firm reviewed Medar's segregation documents and attempted to locate the monuments noted by the prior surveyor. When the firm attempted to access the property enclosed by Sydow's fence, to locate the boundary monument on the northwest corner of Sydow's property, Sydow denied access. The firm sent Sydow a letter requesting permission to enter his property to locate the monument, noting that it had either been "lost" or "could not be recovered due to lack of access." CP at 821. The firm's letter also noted that the fence encroached on the Douglass property and warned Sydow he could not "adversely possess property that was part of a land action as depicted in the noted Certificates of Exemptions." CP at 821. Sydow denied moving the monument.

Ultimately, the firm was unable to find the southwest monument in its recorded location but eventually found the southeast monument on Sydow's fence line, 47.92 feet north of its recorded position. The firm's president opined that the monument must have been moved. The firm produced a depiction of the disputed property, shaded in gray, enclosed by the fence Sydow built along the northern boundary.



EXHIBIT A

CP at 789.

In February 2018, a title insurance company issued title insurance for the Douglass property that specifically exempted the property between the legal description and the fence from coverage, referring to the firm's survey depicting the fence and calling it a "MAJOR FENCE ENCROACHMENT." CP at 831.

In March 2018, Douglass closed on the Saylor property and began plans to develop an apartment complex.

In December 2020, Douglass entered the disputed property without providing warning to Sydow and began clearcutting it. Douglass razed the fence as well as the area south of Sydow's fence, which included Sydow's pet cemetery, family monuments,

wildlife habitats and cameras, Sydow's chairs, and the tree where Sydow's mother's ashes were spread.

*Procedure*

Sydow filed suit against Douglass, asserting ownership of the disputed property by adverse possession and alleging claims for trespass, timber trespass, negligence, quiet title, and negligent infliction of emotional distress based on his ownership.

Following discovery, both parties moved for summary judgment. The trial court denied Sydow's motion, granted Douglass's motion, and dismissed Sydow's complaint. During its colloquy, the court held that Sydow failed to establish the open and notorious element of adverse possession as a matter of law because Sydow moved the boundary marker, and that equitable estoppel and the common grantor doctrine also barred his claims.

Sydow timely appealed.

## ANALYSIS

Both parties moved for summary judgment, claiming there were no issues of material fact. The competing motions raised three central questions: whether the undisputed evidence established, as a matter of law, that Sydow succeeded or failed to prove that he acquired title to the disputed land through adverse possession; and, if so, whether Douglass's affirmative defenses of common grantor and equitable estoppel defeated Sydow's claim of adverse possession. We address these questions in turn.

9

1. ADVERSE POSSESSION

   *A. Standards of Review*

We review an order dismissing a complaint on summary judgment de novo, undertaking the same inquiry as the trial court. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). On cross motions for summary judgment, we view the evidence in the "light most favorable to the nonmoving party with respect to the particular claim." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 597, 260 P.3d 857 (2011). Summary judgment is properly granted where there is no genuine issue as to a material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). On summary judgment, once a moving party establishes this initial burden, the nonmoving party must rebut the moving party's contentions by setting forth specific facts showing there is a genuine issue for trial. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986); CR 56(e). "But a question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion." *Miller v. Likins*, 109 Wn. App. 140, 144, 34 P.3d 835 (2001) (citing *Ruff v. County of King*, 125 Wn.2d 697, 887 P.2d 886 (1995)). Furthermore, we may affirm an "order granting summary judgment . . . on any legal basis supported by the record." *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wn.2d 506, 514, 475 P.3d 164 (2020).

Adverse possession is a mixed question of law and fact: "[w]hether the essential facts exist is for the trier of fact; but whether the facts . . . constitute adverse possession is

for the court to determine as a matter of law." *Peeples v. Port of Bellingham*, 93 Wn.2d

766, 771, 613 P.2d 1128 (1980), *overruled on other grounds, Chaplin v. Sanders*, 100

Wn.2d 853, 676 P.2d 431 (1984).

  *B. Relevant Adverse Possession Legal Principles*

  "'Adverse possession . . . is a doctrine of repose; it [reasons] that at some point

legal titles should be made to conform to appearances long maintained on the ground.'"

*Campbell v. Reed*, 134 Wn. App. 349, 361, 139 P.3d 419 (2006) (first alteration in

original) (quoting 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON

PRACTICE: REAL ESTATE: PROPERTY LAW § 8.1, at 504 (2d ed. 2004)). The doctrine

permits "a party to acquire legal title to another's land by possessing the property for at

least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted,

(3) exclusive, and (4) hostile.'" *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283

P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6

(1989)). "Title vests automatically in the adverse possessor if all the elements are

fulfilled throughout the statutory period." *Id.* at 72. Because the presumption of

possession rests with "the holder of legal title, the party claiming to have adversely

possessed the property has the burden of establishing the existence of each element."

*ITT Rayonier*, 112 Wn.2d at 757 (citation omitted). "Where the facts in an adverse

possession case are not in dispute, whether the facts constitute adverse possession is for

the court to determine as a matter of law." *Id.* at 758.

C. *Open and Notorious Element*

The primary dispute between the parties is whether Sydow has established the element of open and notorious possession. "A claimant may satisfy the open and notorious element by showing either (1) that the [true] owner had actual notice of the adverse use throughout the statutory period" or (2) that the use was so visible and apparent that a reasonable person would have believed the claimant owned the land. *Riley v. Andres*, 107 Wn. App. 391, 396, 27 P.3d 618 (2001); *Shelton v. Strickland*, 106 Wn. App. 45, 51, 21 P.3d 1179 (2001).

Here, the undisputed evidence establishes that both alternative methods of proving this element have been satisfied. The true owners had actual knowledge of Sydow's adverse possession and Sydow's use of the property was sufficiently visible such that a reasonable person would believe that Sydow owned the disputed property.

"[T]he requirement of open and notorious is satisfied if the title holder has actual notice of the adverse use throughout the statutory period." *Sanders*, 100 Wn.2d at 862. In this case, from 2008 until 2020, each true owner of the disputed property had actual notice that Sydow was possessing the property up to the north fence.

Douglass does not contest that Medar and Saylor had knowledge and objected to the fence's placement. In 2008, when Sydow became the owner of his property, the true owner of the disputed land was Medar. The contentious letters between Medar's attorney and Sydow's attorney clearly demonstrate that Medar was aware of the fence built by

12

Sydow and his possession of the land up to the fence. Through attorneys, Medar communicated to Sydow that Medar would be moving the fence, but the fence was never moved and Sydow continued to use the land up to his fence. The next true owner, Saylor, also objected to the location of the fence as encroaching on the intended boundary.

The record is also clear that Douglass had actual knowledge of Sydow's possession of the land south of the fence. In 2017, before purchasing the property, Douglass retained a firm to perform survey work and knew before purchasing the property that the fence encroached on the property it was purchasing. When Douglass closed on the property, the title company exempted the disputed property from title insurance as a major fence encroachment. Despite having actual notice of Sydow's possession of the property south of the fence, and the fact that the fence encroached on Douglass's land, Douglass did nothing until 2020 when it removed the fence, trees, and other improvements.

Douglass does not dispute this evidence but instead asserts that Sydow cannot show that the title owner had actual knowledge for the requisite 10-year period because Douglass had actual knowledge for only 3 years beginning in 2017. Although Douglass does not develop this argument in its brief, the argument implies that a transfer of the title property interrupts or restarts the limitations period. Douglass does not cite any authority to support this implied argument.

The 10-year limitation period for adverse possession is established by RCW

4.16.020(1). This statute essentially provides that a true property owner has 10 years to

file an action to eject an adverse possessor. *Id.* The statutory period runs against each

successive record owner so long as the claimant's possession remains continuous and

each owner in succession had either actual or constructive knowledge. The statute does

not require that any single owner hold title for the entire statutory period. As Professor

William Stoebuck notes:

> What might be called "tacking on the disseisee's side" is very
> common, so common that it is hardly an issue. For simplicity, we suppose
> now that there is one adverse possessor for the full period of the statute, but
> that the record owners of the adversely possessed land transfer it by deed
> while adverse possession is continuing. The adverse possession will
> continue against all of them: the transfers among them will not interrupt it.
> No extended discussion of this principle has been found in the Washington
> decisions, but it is not in doubt. Statements of facts in many decisions
> show that the Washington Supreme Court regards an adverse possession
> that continues against successive record owners as one continuing period.
> The larger underlying principle is that a series of record owners of the
> adversely possessed land are, for purposes of a continuing adverse
> possession against them, treated as one entity. Thus, each successive owner
> takes record title, as it were, encumbered by the ongoing adverse
> possession.

17 STOEBUCK, *supra*, § 8.18, at 540-41.

Here, the undisputed evidence shows that from 2008 until 2020, each successive

owner of the Douglass property had actual notice of Sydow's possession of the disputed

property. "When the owner has actual knowledge of the possession, the requirement's

purpose has been satisfied." *Sanders*, 100 Wn.2d at 862. Consequently, Sydow

establishes as a matter of law the element of open and notorious possession.

Although it is unnecessary to consider the alternative method of proving open and

notorious possession, here we conclude that the evidence also establishes constructive

knowledge of possession. Constructive knowledge requires proof that the "[o]pen and

notorious use is such use that would lead a reasonable person to assume that the claimant

was the owner." *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 211-12, 936 P.2d

1163 (1997). Constructive knowledge focuses on the nature of the possession, not the

true owner's actual knowledge of possession. "[T]he possession must be visible and

known or discoverable to the true owner." *Lloyd v. Montecucco*, 83 Wn. App. 846, 853,

924 P.2d 927 (1996). When considering whether possession was sufficient to give

constructive notice of a claim to the land, courts consider the character of the land.

*Sanders*, 100 Wn.2d at 863. "'The necessary use and occupancy need only be of the

character that a true owner would assert in view of its nature and location.'" *Id.*

(emphasis omitted) (quoting *Krona v. Brett*, 72 Wn.2d 535, 539, 433 P.2d 858 (1967)

*overruled in part by Sanders*).

Sydow's possession of the property up to the fence was sufficiently visible and

apparent that a reasonable person would have believed that Sydow owned the disputed

land. Sydow built a fence in 2006 to mark the boundary. He then used and maintained

the property up to that fence. Clearing, cultivating, and maintaining property to a fence

15

used to mark a boundary has long been recognized as open and notorious possession.[1]

Indeed, surveyors working for Douglass asked Sydow's permission to enter the disputed

property, and Sydow refused permission.

Douglass does not dispute the nature of Sydow's possession. Instead, Douglass

argues that Sydow's possession was surreptitious and not open and notorious because

someone moved the property line boundary marker. From this, Douglass reasons that "a

reasonable person in the true owner's possession would see the boundary monument

along the fence line and conclude the fence was built along the true boundary indicated in

the recorded surveys, certificates of exemption, and deeds." Resp't's Br. at 20.

This argument fails for several reasons. First, the survey pin was not a visible,

known, or discoverable marker of the boundary line. Constructive knowledge requires

that the possession be visible and known or discoverable. Here, there is nothing in the

---

[1] *See Wood v. Nelson*, 57 Wn.2d 539, 540, 358 P.2d 312 (1961) ("A fence is the usual means relied upon to exclude strangers and establish the dominion and control characteristic of ownership."); *Ofuasia v. Smurr*, 198 Wn. App. 133, 144, 392 P.3d 1148 (2017) ("Fences are typical expressions of hostility, evidencing that an adverse possession claimant is treating the land inside the fence as [his] own as against the world.") (internal quotation marks omitted); *Strickland*, 106 Wn. App. at 51 ("[T]he construction and maintenance of a structure on, or partially on the land of another, almost necessarily is exclusive, actual and uninterrupted, open and notorious, hostile and made under a claim of right."); *Metro. Bldg. Co. v. Fitzgerald*, 122 Wash. 514, 516, 210 P. 770 (1922), *overruled on other grounds by Sanders*, 100 Wn.2d 853 (evidence that disputed property within possessor's fences had been cleared and cultivated, buildings had been placed on it, and orchards planted, showed open and notorious possession).

record suggesting that Sydow was possessing the property up to a survey pin that was buried beneath debris and vegetation. Instead, he was possessing the property up to a very visible fence.

Furthermore, constructive notice focuses on whether the possession is of such a nature that a reasonable person would have believed the adverse possessor owned the land, not whether the true owner was on notice that his land was being dispossessed. *See Riley*, 107 Wn. App. at 396-97. The record owner's mistaken belief about who actually owns the disputed property is not relevant. "If the owner knows of the adverse possession and allows it, perhaps in the mistaken belief that the possessor is the owner, this will not prevent the possession's being hostile." 17 STOEBUCK, *supra*, § 8.12, at 528. "For purposes of an adverse possession claim, the nature of possession is determined by the manner in which the parties treated the land, not by their subjective belief regarding their true interests in the land." *Reitz v. Knight*, 62 Wn. App. 575, 581, 814 P.2d 1212 (1991). Similarly, Sydow's subjective belief about the nature of his possession is also irrelevant. *Sanders*, 100 Wn.2d at 861.

Douglass argues that even if summary judgment for Douglass was improper, summary judgment should not be entered for Sydow because a fact finder could conclude that Sydow moved the boundary monument and his possession was thus deceptive. We disagree that Douglass raises a material issue of fact. Sydow's subjective intentions (assuming he moved the boundary pin) are not relevant so long as his possession was

17

objectively open, notorious, and hostile.  *Roy v. Cunningham*, 46 Wn. App. 409, 412, 731 P.2d 526 (1986) ("The claimants' subjective belief and intent to dispossess or not dispossess another are not relevant" in determining the hostility element.).  Nor is there any requirement that an adverse possessor take possession in "good faith."  *LeBleu v. Aalgaard*, 193 Wn. App. 66, 80, 371 P.3d 76 (2016) (Fearing, J., concurring).  Likewise, as noted above, the possession does not have to be of such a nature that the true owner would know that their land is being dispossessed.

While the question of who moved the monument is in dispute, Douglass fails to demonstrate that this fact is *material* to Sydow's claim of adverse possession.  Regardless of whether the monument was moved, or by whom, it does not change the undisputed fact that Douglass and its predecessors had both actual and constructive notice that Sydow was possessing the disputed property up to the fence and the pin, as an owner.  The question is whether Sydow's possession of the property was open and notorious, not whether his claim to the property was legitimate.  If anything, any movement of the monument by Sydow bolsters the notorious and hostile nature of his adverse possession.  Adverse possession often rewards a wrongdoer.  *Aalgaard*, 193 Wn. App. at 83 (Fearing, J., concurring).

2.   COMMON GRANTOR DOCTRINE LEGAL PRINCIPLES

Douglass argues that Sydow's claim of adverse possession is defeated by the common grantor doctrine.

18

"It has long been the law in Washington that '[t]he location of a line by a common grantor is binding upon the grantees.'" *Pendergrast v. Matichuk*, 186 Wn.2d 556, 564, 379 P.3d 96 (2016) (quoting *Turner v. Creech*, 58 Wash. 439, 443, 108 P. 1084 (1910)). The line will also be binding on grantees if "the land was sold and purchased with reference to the line, and that there was a meeting of the minds as to the identical tract of land to be transferred by the sale." *See Kronawetter v. Tamoshan, Inc.*, 14 Wn. App. 820, 826, 545 P.2d 1230 (1976).

Applying the "common grantor doctrine involves [a two-part inquiry]: (1) was there an agreed boundary established between the common grantor and the original grantee, and (2) if so, would a visual examination of the property indicate to subsequent purchasers that the deed line was no longer functioning as the true boundary?" *Winans v. Ross*, 35 Wn. App. 238, 241, 666 P.2d 908 (1983).

"The common grantor doctrine recognizes the original grantee's good faith reliance on the boundary description provided by the common grantor who originally owned both lots in their entirety and thus had it completely within his power to determine the location of that boundary. It is for this reason that subsequent grantees of the common grantor are bound by the location of that boundary, *as long as it is apparent by a visual examination of the property*." *Levien v. Fiala*, 79 Wn. App. 294, 302, 902 P.2d 170 (1995) (citation omitted) (emphasis added).

*Atwell v. Olson*, 30 Wn.2d 179, 190 P.2d 783 (1948), provides a helpful example of the common grantor doctrine's application. There, the Crooks owned a parcel of land and entered into a contract to sell the southern half of the parcel to the Forsmans. *Id.* at 180. The Crooks measured off and established the dividing line between the northern and southern halves by setting stakes at both ends of the line. *Id.* Both the Crooks and the Forsmans agreed that the staked line was the dividing line between the two properties. *Id.* at 180-81. Relying on this line, the Forsmans planted a hedge that covered two-thirds of the dividing line. *Id.* at 181. The Forsmans then built a house on the property and cultivated the land up to the hedge. *Id.* The Forsmans later sold their property to the Atwells, who also occupied and built onto the property up to the hedge. *Id.*

The Crooks's property was eventually sold to the Krusells, who also occupied the northern property up to the hedge. *Id.* The Krusells later sold to the Olsons, who then had the property surveyed. *Id.* The survey showed that the boundary line should have been 14.7 feet south of the hedge. *See id.* As a result, the Olsons threatened to encroach on the Atwells's property and to destroy the hedge and other improvements. *Id.* at 181-82. The Atwells then sued to enjoin the Olsons's trespassing and quiet title up to the hedge. *Id.* at 183.

On appeal, the court applied the common grantor doctrine and concluded that the hedge "became the true line of the property," and that the line was binding on the successors in interest to the Crooks and Forsmans. *Id.* The court reasoned that the

Olsons "purchased with full knowledge of the existence of the hedge and the improvements, made by [the Atwells] and their predecessors in interest, up to the line of the hedge, and purchased with notice that the hedge marked the true dividing line" between the properties. *Id.* at 184.

Sydow argues that the common grantor doctrine does not apply here. He asserts the doctrine applies only when a common grantor and original grantee establish a visible boundary on the ground that differs from the legal description of the boundary in the deed, and subsequent purchasers take title with reference to that visible line. He contends the doctrine is a tool for validating a boundary that has supplanted the legal description, not for enforcing the legal description itself.

Douglass argues the doctrine applies here because Medar created the boundary through the recorded legal description and Sydow had actual notice of that description. Douglass asserts there was a meeting of the minds based on the deed, segregation materials, and Sydow's agreement to move the fence. Douglass further argues that visibility on the ground is unnecessary when a grantee has actual notice of the boundary and relies on *Rinehold v. Renne*, 198 Wn.2d 81, 492 P.3d 154 (2021), and *Angell v. Hadley*, 33 Wn.2d 837, 207 P.2d 191 (1949), to contend the doctrine can enforce the boundary described in the legal description.

We conclude the common grantor doctrine does not apply to these facts. The doctrine requires a visible boundary that supplants the boundary described in the legal

description. The doctrine exists to validate a visible boundary that parties have adopted in place of the property line identified in the deed's legal description. *See, e.g., Atwell*, 30 Wn.2d at 183-84. Washington decisions applying the doctrine have all involved visible physical boundaries inconsistent with the deed line. *See, e.g., id.* at 181 (two stakes and a hedge); *Winans*, 35 Wn. App. 238 (existing fence); *Thompson v. Bain*, 28 Wn.2d 590, 183 P.2d 785 (1947) (existing fence); *Strom v. Arcorace*, 27 Wn.2d 478, 178 P.2d 959 (1947) (existing fence). Here, the boundary described in the legal description was not visible.

Douglass's contrary arguments are unpersuasive. First, its contention that the doctrine may be used to enforce the legal description in the deed fails. As discussed above, Washington decisions apply the doctrine where a visible boundary contradicts the deed, not the other way around. Similarly, Douglass's argument that there was a meeting of the minds based on the deed, segregation materials, and Sydow's agreement to move the fence fails because any meeting of the minds must relate to a visible boundary. *See Winans*, 35 Wn. App. at 241.

Douglass's reliance on *Rinehold* and *Angell* to support its argument that the common grantor doctrine can be applied to enforce the legal description in the deed is misplaced. In *Rinehold*, our Supreme Court addressed a boundary dispute involving a subdivision where the common grantor, Watson, conveyed parcels using a legal description that referenced a "road-way." 198 Wn.2d at 83. Over time, multiple surveys

22

attempted to retrace that original boundary location, but those surveys conflicted as to whether Watson intended the boundary to follow the actual road on the ground. *Id.* at 84-88. Because the competing surveys created evidentiary disputes over the physical location of the boundary the grantor intended to fix, the Supreme Court held that summary judgment was improper. *Id.* at 91-97. In reaffirming the common grantor doctrine, the court emphasized that the doctrine turns on determining the boundary the grantor actually located. *Id.* at 91-92. But the court did not hold that the boundary described in the deed controlled. *See id.* at 91-97.

In *Angell*, our Supreme Court upheld a boundary line that had been visibly established and mutually recognized by adjoining property owners by applying the common grantor doctrine. *Angell*, 33 Wn.2d at 838. Almost two decades prior, the common grantor owned the adjoining properties at issue and, at the buyers' insistence, hired a surveyor to mark the boundary between them on the ground with iron stakes. *Id*. The original grantees occupied and used their properties in accordance with that marked line, and their successors, including the appellants, were shown the same boundary line when they purchased the properties. *Id*. Although a later survey suggested the original survey may have been erroneous and some later witnesses could not locate the original stakes, the court held that the trial court correctly determined that the boundary line, agreed to by the original parties, controlled under the common grantor doctrine. *Id.* at 838-39.

23

Here, there is no visible boundary line corresponding to the legal description in the deed. The only visible boundary line was the fence. Enforcing an invisible boundary would contradict the holding in *Angell*. Neither *Rinehold* nor *Angell* supports using the doctrine to enforce a deed line that is not visible on the ground. Thus, the trial court erred in granting summary judgment to Douglass on this basis.

3.  EQUITABLE ESTOPPEL LEGAL PRINCIPLES

Alternatively, Douglass argues equitable estoppel required dismissal of Sydow's adverse possession claim. Douglass contends Sydow represented the boundary line by acquiescing to the legal description of the properties in several documents created when Medar was dividing and transferring the two lots. Specifically, Douglass claims the legal descriptions set forth by Medar in the segregation materials, redemption agreement, and deeds were attributable to Sydow. In addition, Douglass maintains that Sydow agreed and represented the true boundary line by accepting Medar's offer in 2006 to move the fence in exchange for a deed to the property. Douglass argues it relied on these documents when purchasing the Douglass Property.

"The doctrine of equitable estoppel rests on the principle that a person 'shall not be permitted to deny what he has once solemnly acknowledged.'" *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 53, 271 P.3d 973 (2012) (quoting *Arnold v. Melani*, 75 Wn.2d 143, 147, 449 P.2d 800 (1968)). Its elements are well established: (1) an admission, statement or act inconsistent with the claim later asserted, (2) action by

the other party in reasonable reliance on that admission, statement, or act, and (3) injury to the relying party from allowing the first party to contradict or repudiate the prior admission, statement, or act. *Lybbert v. Grant County*, 141 Wn.2d 29, 35, 1 P.3d 1124 (2000). Importantly, reliance is justified only when the party claiming estoppel did not know the true facts and had no means to discover them. *PUD No. 1 v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 365, 705 P.2d 1195, 713 P.2d 1109 (1985).

Generally, equitable estoppel is not favored and must be proved by the asserting party with clear, cogent and convincing evidence. *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 121 Wn.2d 726, 734, 853 P.2d 913 (1993). Equitable estoppel is a question for the trier of fact "'[u]nless only one reasonable inference can be drawn from the evidence.'" *Id.* at 737 (alteration in original).

Douglass's equitable estoppel argument fails because Douglass had knowledge of the true facts and because it cannot demonstrate reasonable reliance on any statements attributable to Sydow. The undisputed evidence shows Douglass ordered its own survey before closing, learned that the fence encroached beyond the deed line, and received a title policy expressly exempting coverage for the fence encroachment. Because it is undisputed that Douglass had actual knowledge that Sydow was possessing the disputed property and Sydow's fence encroached on the property Douglass was intending to purchase, Douglass cannot show that it relied on the legal descriptions. *Wash. Pub.*

25

*Power Supply Sys.*, 104 Wn.2d at 365 (explaining that reliance is justified only when the party claiming estoppel did not know the true facts and had no means to discover them).

Douglass argues that it did not have to prove reasonable reliance, and thus its knowledge of the fence was immaterial because Sydow's representation in the 2006 settlement letter between Medar and Sydow was fraudulent. Douglass quotes *Leonard v. Washington Employment, Inc.*, 77 Wn.2d 271, 461 P.2d 538 (1969), for the proposition that, "[A]bsent fraud or misrepresentation, estoppel runs in favor only of those who have reasonably relied on another's conduct or declarations." Resp't's Br. at 27 (alteration in original). Douglass claims that Sydow's promise to move the fence when he had no intention of doing so was a misrepresentation.

Douglass's characterization of the evidence is not supported by the record. Instead, the record cited by Douglass shows that Sydow agreed to let Medar move the fence, at Medar's expense, in exchange for a deed to the property. Despite Sydow's acquiescence, Medar never moved the fence. The record fails to show that Sydow made misrepresentations that he would move the fence.

Additionally, Douglass fails to provide any analysis on how the rule cited in *Leonard* applies to the facts in this case. *See* RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (We need not consider arguments that are unsupported by meaningful analysis or authority.). Nevertheless, we do not read *Leonard* as relieving Douglass of proving reliance even in the face of fraud or

misrepresentation. Even under the common law tort of negligent misrepresentation, a buyer cannot justifiably rely on a seller's representation if the defect is known by the buyer or obvious upon the buyer's inspection. *Douglas v. Visser*, 173 Wn. App. 823, 834 & n.3, 295 P.3d 800 (2013).

Finally, Douglass cannot show reliance on the 2006 letter between Medar and Sydow, reasonable or otherwise. The letter was not recorded, and Douglass did not learn of this communication until discovery in this case.

Douglass next argues that Sydow made representations about the true boundary line in legal documents including the legal description of his lot. Specifically, Douglass points to the legal description in Medar's segregation documents and the legal description in the recorded survey. However, none of Medar's statements in the segregation documents and survey are attributable to Sydow.

As a limited liability company, Medar is a separate entity. *See* RCW 25.15.071(3). Sydow owned a 2.5 percent nonvoting, non-member interest in Medar. Even if he was considered a member of Medar, members of a limited liability company (LLC) are not personally liable for the LLC's obligations or liabilities. RCW 25.15.126. Moreover, Sydow did not sign the segregation documents. Douglass therefore cannot show that Sydow made representations about the true boundary line in those documents.

Even if the legal descriptions could be characterized as statements attributable to Sydow, the statements were made between 2006 and 2008. Douglass does not cite any

27

authority that would support its position that acknowledging a legally described boundary forever precludes a person from making a subsequent claim of adverse possession. *See Nickell*, 167 Wn. App. at 55 (Even assuming claimant's silence could be construed as a representation of ownership, there was no evidence that the claimants "agreed to waive their right to bring a later action to quiet title to the disputed strip, or that they otherwise conveyed away their already-acquired adverse possession title.").

Douglass fails to show that Sydow made any representations about the boundary line and also fails to show that Douglass relied on any such statements. The statements cited by Douglass were not made by or attributable to Sydow, were made eight years before, and Douglass had actual knowledge before it purchased the property that Sydow's possession contradicted the legal description. Douglass's claim of equitable estoppel therefore fails and the trial court erred in granting its motion on this theory.

4. SYDOW'S CLAIM OF ADVERSE POSSESSION

Having concluded that summary judgment in favor of Douglass was improper, we next consider whether the trial court erred in denying Sydow's motion for partial summary judgment on his claim of adverse possession. For this issue, we view the facts in the light most favorable to Douglass, because it is the nonmoving party. Sydow argues there were no genuine issues of material fact and that the undisputed evidence establishes all elements of adverse possession as a matter of law. We agree.

"[A]dverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'" *Gorman*, 175 Wn.2d at 71 (quoting *ITT Rayonier, Inc.*, 112 Wn.2d at 757). Here, the undisputed evidence establishes these elements as a matter of law.

As set forth above, Sydow established the open and notorious element. As to the element of hostility, at oral argument Douglass asserted that it was challenging Sydow's evidence on this element even though its brief does not mention the hostility element. Wash. Ct. of Appeals oral argument, *Sydow v. Douglass Prop., LLC*, No. 40537-1-III (Dec. 2, 2025), at 30 min., 7 sec., to 30 min., 13 sec. (on file with court). We recognize that the hostility element often overlaps with the other elements:

> "Open" and "notorious," besides largely overlapping each other, also overlap the elements of "actual" and "hostile." A usage that is substantial enough to be actual is likely to be one that is also open and notorious. Then notoriousness of use is an aspect of hostility, in the sense that an unpermitted use that is known or knowable to the true owner seems more hostile to his title than a use about which he does not know and would not be expected to know.

17 STOEBUCK, *supra*, § 8.11, at 524.

Here, the undisputed evidence is that Sydow's possession was that of a true owner: hostile to the claims of any other.

29

Otherwise, Douglass does not dispute that Sydow's possession was actual, uninterrupted, and exclusive. Sydow also demonstrated that he possessed the disputed property for at least 10 years. *See* RCW 4.12.020; RCW 7.28.010. "Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period." *Gorman*, 175 Wn.2d at 72. Although Douglass impliedly argues the 10-year limitation period did not run because Douglass purchased the property 3 years before removing the fence, we rejected that argument above.

The undisputed evidence establishes that Sydow adversely possessed the disputed property for the requisite 10-year period. In addition, Douglass's asserted defenses fail as a matter of law. Consequently, the trial court erred in granting summary judgment for Douglass and denying Sydow's motion for partial summary judgment on his claim for adverse possession.

5. REMAINING CLAIMS

Sydow argues the trial court erred in dismissing his tort claims. He maintains those claims were dismissed solely because the court concluded he did not own the disputed property. Douglass responds that dismissal of these claims was proper because each depended on Sydow's adverse possession theory and therefore failed once the trial court determined Douglass owned the disputed property. In the alternative, Douglass argues that even if adverse possession were established, Sydow's negligence claims still

fail because he did not raise the alleged duties below and cites no authority supporting them.

Because we conclude Sydow established adverse possession of the disputed property as a matter of law, we agree with Sydow that dismissal of these claims on the basis that Sydow did not own the property was error.

6. ATTORNEY FEES

Both parties request an award of attorney fees and costs at the trial court level and for this appeal under RAP 18.1 and RCW 7.28.083(3).

RCW 7.28.083(3) authorizes the court to award attorney fees to the prevailing party in adverse possession lawsuits:

> The prevailing party in an action asserting title to real property by adverse possession may request the court to award costs and reasonable attorneys' fees. The court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just.

Sydow established adverse possession of the disputed property as a matter of law and is the prevailing party in the action asserting title. We therefore conclude it is just and equitable to award Sydow his reasonable attorney fees under RCW 7.28.083 both at the trial level and at the appellate level. Douglass's incursion into the disputed property without notice and its destruction of cherished landscaping and personal property particularly warrants the award of fees under equity. On remand, the trial court will

31

determine the amount of attorney fees to be awarded to Sydow for his adverse possession claim.

We reverse the trial court's orders granting Douglass's motion on summary judgment, awarding Douglass its costs and attorney fees, and dismissing all of Sydow's claims against Douglass. We also reverse the trial court's denial of Sydow's motion for partial summary judgment. We remand with instructions for the trial court to enter an order granting Sydow's motion on his claim of adverse possession and to determine Sydow's attorney fees on this claim. Sydow can pursue his remaining tort claims on remand.

_____
Staab, C.J.

WE CONCUR:

_____
Fearing, J.P.T.[†]

_____
Murphy, J.

_____
[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).